**CASES ARGUED AND DETERMINED**

IN THE

# SUPREME COURT

OF THE

# STATE OF CONNECTICUT

---

## MARK BANKS *v.* COMMISSIONER OF CORRECTION
### (SC 20222)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

In accordance with this court's decision in *State* v. *Salamon* (287 Conn. 509), when a criminal defendant is charged with kidnapping in conjunction with another underlying crime, such as robbery, the jury must be instructed that the defendant cannot be convicted of kidnapping if the restraint imposed on the victim was merely incidental to the commission of that underlying crime.

The petitioner, who had been convicted of multiple counts of kidnapping in the first degree and robbery in the first degree in connection with armed robberies at two separate retail stores, sought a writ of habeas corpus, claiming that his due process right to a fair trial under the fifth and fourteenth amendments to the United States constitution was violated. In each armed robbery, after the petitioner obtained money from his victims, he forced them at gunpoint into the store's bathroom and attempted to jam the bathroom door shut. The victims remained inside of the bathroom for only a few minutes, exiting once they believed that the petitioner left the store. Following this court's determination that *Salamon*, which had been decided more than ten years after the petitioner's trial, applied retroactively in habeas actions, the petitioner challenged his kidnapping convictions on the ground that the jury instructions at his criminal trial were not in accordance with the require-

---

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Banks *v.* Commissioner of Correction

ments set forth in *Salamon*. The habeas court denied the petitioner's habeas petition, concluding that the respondent, the Commissioner of Correction, had demonstrated that the absence of a *Salamon* instruction was harmless error. On the granting of certification, the petitioner appealed to the Appellate Court, which reversed the habeas court's judgment. The Appellate Court concluded that a jury reasonably could have found that the petitioner's movement and restraint of the victims were part of a continuous, uninterrupted course of conduct related to the robberies. The Appellate Court applied the harmless error standard set forth in *Neder* v. *United States* (527 U.S. 1) in determining that the absence of a *Salamon* instruction was not harmless beyond a reasonable doubt. On the granting of certification, the respondent appealed to this court. *Held*:

1. The standard articulated in *Brecht* v. *Abrahamson* (507 U.S. 619), which requires a new trial only if the instructional error had a substantial and injurious effect or influence in determining the jury's verdict, applies to *Salamon* claims raised in habeas proceedings: contrary to the petitioner's assertion that stare decisis required the application of the *Neder* standard, this court had not previously resolved the question of which standard applied to *Salamon* errors on collateral review; moreover, the *Brecht* standard provided the proper harmless error standard for *Salamon* errors in habeas actions, as it was consistent with the handling of other claims of error in habeas proceedings by both this court and the federal courts, a number of sister state courts had adopted that standard for the collateral review of constitutional errors, and it afforded a habeas petitioner significant protection, requiring a new trial unless the reviewing court has confidence that a properly instructed jury would have found the petitioner guilty beyond a reasonable doubt; furthermore, two of the principal rationales for applying a different harm standard (the *Brecht* standard) to constitutional errors in habeas actions than the harm standard applied to constitutional errors raised on direct appeal, namely, the finality of judgments and the extraordinary nature of the habeas remedy, applied equally to state and federal habeas proceedings, the United States Supreme Court previously had rejected the petitioner's claim that the rule preventing a trial court from directing a guilty verdict prohibited a reviewing court from finding that a *Salamon* error was harmless when the evidence presented at trial compelled such a conclusion, the *Brecht* standard was not so vague as to be difficult to apply, and the application of the *Brecht* standard would not be unfair to the petitioner but, rather, would strike a balance between bestowing a windfall on the petitioner and penalizing him for failing to anticipate this court's reinterpretation of this state's kidnapping statutes.

2. The habeas court correctly determined that the trial court's failure to instruct the jury at the petitioner's criminal trial in accordance with *Salamon* was harmless because it did not give rise to a risk of prejudice sufficient to undermine confidence in the verdict, and, accordingly, the

Banks *v.* Commissioner of Correction

Appellate Court's judgment was reversed: under *Salamon*, the jury, having found abduction, restraint, and the criminal intent associated therewith, necessarily had to find the petitioner guilty of kidnapping under the applicable statute (§ 53a-92 (a) (2) (B)) unless it found that the restraint and associated criminal intent were limited to that inherent in the robberies; moreover, even though the petitioner did not move his victims a great distance or restrain them for a long period of time, the jury could not reasonably have found that the asportation and restraint were limited to that which was necessary to carry out the robberies, as the actions occurred after the objective of each robbery had been completed, were conducted in order to make it more difficult for the victims to summon assistance and to reduce the petitioner's risk of detection, and subjected the victims to unique risks and harms, both physical and psychological, beyond those inherent in the robberies themselves.

(*Three justices concurring separately in two opinions*)

Argued December 16, 2019—officially released May 12, 2021**

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to the Appellate Court, *DiPentima, C. J.*, and *Prescott, J.*, with *Keller, J.*, dissenting, which reversed the judgment of the habeas court and remanded the case with direction to grant the petition, and the respondent, on the granting of certification, appealed to this court. *Reversed*; *judgment directed*.

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, former state's attorney, and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellant (respondent).

*Pamela S. Nagy*, assistant public defender, for the appellee (petitioner).

** May 12, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Banks *v.* Commissioner of Correction

*Opinion*

PALMER, J. In this certified appeal and the companion case decided herewith; see *Bell* v. *Commissioner of Correction*, 339 Conn. 79,       A.3d       (2021); we again revisit our decision in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), in which we overruled our long-standing interpretation of this state's kidnapping statutes and held that, when a criminal defendant is charged with kidnapping in conjunction with another underlying crime, such as rape or assault, the jury must be instructed that the defendant cannot be convicted of kidnapping if the restraint imposed on the victim was merely incidental to that underlying crime. See id., 542–50. We now must resolve two questions left open by *Salamon* and its progeny. First, when a petitioner seeking habeas relief establishes a *Salamon* error, does the habeas court assess the harm of that error according to the legal standard that the United States Supreme Court articulated in *Brecht* v. *Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (new trial is mandated if instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks omitted)), or the more petitioner friendly standard that the high court adopted in *Neder* v. *United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (new trial is required unless it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the [instructional] error")? Second, did the habeas court in the present case, in denying the habeas petition of the petitioner, Mark Banks, and ruling in favor of the respondent, the Commissioner of Correction, correctly conclude, as a matter of law, that a *Salamon* error is harmless when a perpetrator forcibly removes his victims from the scene of a robbery after having taken their property and then restrains them in order to facilitate his escape? Or, in the alternative, did

Banks *v.* Commissioner of Correction

the Appellate Court, in reversing the judgment of the habeas court, correctly conclude that the petitioner was entitled to a new trial because a jury reasonably could have found that the petitioner's postrobbery movement and restraint of his victims was merely incidental to the underlying crimes and bore no independent criminal significance? See *Banks* v. *Commissioner of Correction*, 184 Conn. App. 101, 131–32, 194 A.3d 780 (2018). We conclude that the *Brecht* standard, which governs federal habeas actions, applies in state habeas proceedings as well.[1] We further conclude that the habeas court correctly determined that the trial court's failure to instruct the petitioner's jury in accordance with *Salamon* was harmless. Accordingly, we reverse the judgment of the Appellate Court.

I

In 1995, the petitioner was arrested and charged in connection with the armed robberies of two Bedding Barn stores, the first in Newington and the second in Southington. The two cases were consolidated and tried jointly before a jury in October, 1997. The facts that the jury reasonably could have found with respect to both robberies are set forth by Judge (now Justice) Keller in her dissent from the opinion of the Appellate Court majority in the present case. See *Banks* v. *Commissioner of Correction*, supra, 184 Conn. App. 140–43 (*Keller, J.*, dissenting). "With respect to the earlier of the two robberies . . . Michael Kozlowski testified that he was working at the Newington Bedding Barn on August 30, 1995, at about 9 p.m. As Kozlowski prepared to close

_____

[1] As we explain more fully hereinafter, the *Brecht* harmless error standard, as we apply it in the context of *Salamon* errors, requires essentially the same showing as that required for constitutional claims alleging ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and suppression of material, exculpatory evidence under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Banks *v.* Commissioner of Correction

the store, the petitioner entered. Kozlowski testified that he approached the petitioner with the belief that the petitioner was a customer. When Kozlowski showed the petitioner a king-size bed, the petitioner said, 'let me count my money,' and reached into his bag and produced a gun. Kozlowski testified that the petitioner said, '[d]on't try anything, I'll bust you one, just walk over to the register.' The petitioner then told him to get behind the counter and pointed his gun at Kozlowski's chest. Kozlowski testified that, after the petitioner took the money from the cash register and a wallet from his coworker, Howard Silk, '[the petitioner] moved [Kozlowski and Silk] . . . down to the hallway into the bathroom and . . . he then put [them] into the bathroom and put a mop handle or something behind the door.' Kozlowski testified that the petitioner, as they walked down the hallway to the bathroom, said, '[d]on't try anything; I'll blow your head off . . . .' Kozlowski indicated that, after the petitioner closed the bathroom door and locked Kozlowski and Silk in there, '[they] ducked down thinking he was going to shoot through the door because it was only a piece of plywood, basically, and, [a] couple of minutes after, [they] heard a bell, which [was] on the front door, [and which rings whenever someone enters or leaves the store] . . . . [They] then . . . kicked the door, basically, and went downstairs.'

"Silk testified that he also was working at the Newington Bedding Barn during the evening of August 30, 1995. Silk stated that, as he was in the process of closing the store, he noticed the petitioner following Kozlowski toward the counter. As the petitioner and Kozlowski approached, Silk realized that the petitioner was pointing a gun at Kozlowski's back. Silk testified that the petitioner told Kozlowski and Silk that he wanted the money, so Kozlowski took the money from the register as the petitioner pointed the gun at Silk's chest. After

Banks *v.* Commissioner of Correction

Silk told the petitioner that there was no safe inside the store, the petitioner led Silk and Kozlowski toward the back of the store at gunpoint. Silk testified that he handed the petitioner the $17 in his wallet and then the petitioner 'proceeded to put [them] into the bathroom area' and attempted to jam the door with a mop handle. Silk testified that he believed that the petitioner put them in the bathroom so that he could escape and that, after less than two minutes [possibly less than one minute], he heard the bell ring that 'goes off when [the door] opens and . . . [he] hoped that [the bell had rung] when [the petitioner] left.' After waiting for thirty seconds after hearing the doorbell ring, Silk and Kozlowski were easily able to open the bathroom door. Silk testified that they went downstairs into the basement of the building to the warehouse . . . to call 911 and wait for the police to arrive in the event that the petitioner was still on the first floor.

"In the second case, Kelly Wright testified that she was working at the Southington Bedding Barn on September 13, 1995. She recalled that, at 8:55 p.m., five minutes before the store was set to close, while Wright's roommate, Idelle Feltman, was waiting in the store to take her home, the petitioner and an unidentified female entered the store. Wright testified that the petitioner and the female split up and appeared to be shopping for king-size beds. Wright testified that she was sitting behind the store counter when the petitioner arrived and that she rose in order to greet him because it was store policy to do so whenever a potential customer arrived. Before Wright could make it around the counter, however, the petitioner told her to get on the floor. Wright testified that she noticed that the petitioner had a gun in his hand and was holding it out parallel to the floor. The petitioner told Feltman to get the money from the register. Feltman gave the petitioner the money in the register in a bank bag. Wright

testified that the petitioner then inquired if there was a basement in the store, and Feltman responded by telling the petitioner that there was no basement . . . but [that] there was a bathroom. Wright testified that the petitioner led her and Feltman to the bathroom at gunpoint and told them to enter the bathroom, lock the door, and 'not to be a hero, let the cops do their jobs.' Wright stated that she heard a buzzer go off, which indicated that the door to the store had been opened. She and Feltman waited for a 'little bit,' unlocked the door, and left the bathroom to call 911. Wright estimated that about five to six minutes elapsed between the time the petitioner entered the store [and] the time she and Wright were able to contact the police.

"Feltman testified that she went to the Southington Bedding Barn to pick up Wright from work because the two planned to go out to dinner. During her testimony, she recalled that two people, the petitioner and a woman, entered the store right before closing and that the pair split up after they entered the store. Feltman testified that the petitioner approached the counter and removed a gun from his bag. He waved the gun and told her to give him the money in the register. Feltman emptied the register, which contained less than $100, and handed the money to the petitioner. Feltman testified that, after he obtained the money, the petitioner inquired whether there was a basement in the store and that Feltman and Wright replied that there was no basement . . . but [that] there was a bathroom. Feltman stated that the petitioner led her and Wright in a single-file line to the bathroom and then instructed them to enter, while aiming the gun at them and causing them to be scared. Feltman and Wright entered the bathroom and waited a minute or two after they heard the door buzzer that indicated someone had entered or left the store. At this point, the two left the bathroom and found a mattress that had been placed in the narrow hallway

Banks *v.* Commissioner of Correction

leading to the bathroom as a 'barricade . . . .' Feltman testified that she pushed it off to the side and 'walked right through.' " (Footnote omitted.) Id.

The following additional facts and procedural history also are relevant to the present appeal. At trial, the petitioner did not seriously contest that the charged crimes occurred as alleged. Rather, his primary defense was that the various victims had misidentified him as the perpetrator and that no evidence other than the victims' eyewitness testimony linked him to the crimes. Therefore, the vast majority of defense counsel's questions during cross-examination pertained to the identity issue, although counsel did inquire whether the perpetrator had physically pushed the victims toward the bathrooms, how far the bathrooms were situated from the cash registers where the robberies occurred, and the ease with which the victims exited the bathrooms. There was testimony that the bathroom in the Newington store was located approximately twenty-four feet from the register.

During closing arguments, the prosecutor acknowledged in his introduction that Connecticut's definition of kidnapping was counterintuitive, and he argued that "what we have here is clearly kidnapping in the state of Connecticut." His argument as to the alleged kidnapping focused entirely on the petitioner's conduct *after* having completed the robberies: "[T]he use of the gun to herd the people into the back room, I'd argue to you, is that type of restraint. Obviously, they are not free to leave . . . even that particular area, the path [toward] the bathroom. They are . . . obviously not free to leave the building. They are not free to go call the police. They are restricted in their movements, again, and the intent of the [petitioner] or again since we are right now discussing what's not in dispute, the intent of the person who committed this crime was to accomplish the commission of a felony, that is, this was part of

Banks *v.* Commissioner of Correction

the plan to allow him to escape from committing this robbery.'' The prosecutor thus argued the case as if (1) it was undisputed that the perpetrator had forced the victims to enter and remain in the bathroom at gunpoint in order to facilitate his escape from the robbery scene, and (2) the kidnapping allegedly was predicated on the restraint of the victims only after the perpetrator had taken the money from the cash registers.

In his closing argument, defense counsel conceded that the robberies took place as alleged, contesting only that the petitioner was the perpetrator. He also essentially agreed with the prosecutor that the underlying facts were not in dispute: ''As [the prosecutor] pointed out to you, this case begins and ends with identification, and I have conceded essentially that to you.'' Defense counsel also conceded that the conduct that the state had identified as kidnapping transpired after the robberies had occurred: ''You and I, we don't want to be on the other side of what we think might be a real, live gun with a person who appears to be *robbing us and then asking us to go to a back room* and saying, don't be a hero.'' (Emphasis added.)

The jury found the petitioner guilty of four counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B),[2] four counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), and two counts of criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 1995) § 53a-217c. The trial court rendered judgment in accordance with the jury verdict and sentenced the petitioner to a total effective sentence of twenty-five years incarceration consecutive to any sentence the petitioner was presently serving. The Appellate Court rejected the petitioner's claims on appeal, and this court denied his petition for certification to appeal to this

---

[2] The relevant statutory text is discussed in part III B of this opinion.

Banks *v.* Commissioner of Correction

court. *State* v. *Banks*, 59 Conn. App. 112, 113–14, 755 A.2d 951, cert. denied, 254 Conn. 950, 762 A.2d 904 (2000). At no time on appeal did the petitioner challenge the propriety of the trial court's jury instructions on kidnapping.

Thereafter, in 2008, more than one decade after the petitioner's trial, we decided *Salamon*, in which "we reconsidered our long-standing interpretation of our kidnapping statutes, General Statutes §§ 53a-91 through 53a-94a. . . . [In that case] [t]he defendant [Scott Salamon] had assaulted the victim at a train station late at night . . . and ultimately was charged with kidnapping in the second degree in violation of [General Statutes] § 53a-94, unlawful restraint in the first degree, and risk of injury to a child. . . . At trial, [Salamon] requested a jury instruction that, if the jury found that the restraint had been incidental to the assault, then the jury must [find him not guilty] of the charge of kidnapping. . . . [Consistent with established precedent of this court] [t]he trial court declined to give that instruction [and Salamon was convicted of second degree kidnapping in addition to the two other crimes]. . . .

"[On appeal, Salamon requested that we reexamine] our long-standing interpretation of the kidnapping statutes to encompass even restraints that merely were incidental to and necessary for the commission of another substantive offense, such as robbery or sexual assault. . . . We [did so and] ultimately concluded that [o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that

Banks *v.* Commissioner of Correction

which is necessary to commit the other crime. *State* v. *Salamon*, supra, 287 Conn. 542.

"We explained in *Salamon* that a defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that had independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was not merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various . . . factors [relevant thereto] . . . . Id., 547–48." (Citations omitted; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 459–60, 988 A.2d 167 (2009).

Three years later, in *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 12 A.3d 817 (2011), we held that *Salamon* applies retroactively in habeas actions. See id., 751, 760 (plurality opinion). That is, an individual, such as the petitioner in the present case, who was convicted before we decided *Salamon* can nevertheless bring a habeas action challenging his conviction on the ground that his or her jury was not properly instructed as to the meaning of the kidnapping statutes, as clarified in *Salamon*.[3]

---

[3] After *Luurtsema*, we held, in *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 136 A.3d 596 (2016), that the procedural default rule does not bar postconviction claims that the trial court failed to instruct the jury as required under *Salamon* in cases rendered final before our decision in *Salamon*. Id., 61. We discuss our decision in *Hinds* in greater detail in parts II B and III D of this opinion.

Banks *v.* Commissioner of Correction

Because, however, *Luurtsema* involved two questions reserved by the habeas court for the advice of this court limited to the issue of retroactivity; see id., 743 (plurality opinion); we did not have occasion in that case to decide what harmless error standard applies to *Salamon* errors in the habeas context. Subsequently, in 2014, the petitioner in the present case filed the petition for a writ of habeas corpus that is the basis of this appeal. In his amended petition, the petitioner alleged a violation of his due process right to a fair trial under the fifth and fourteenth amendments to the United States constitution, challenging his four kidnapping convictions on the ground that the instructions given to the jury were not in accordance with *Salamon*.

The habeas court denied the petition. The court concluded that the respondent had demonstrated that the absence of a *Salamon* instruction at the petitioner's criminal trial was harmless error because the "movements and confinements [of the victims] were perpetrated *after* the crimes of robbery were committed and [could not] conceivably be regarded as coincidental with or necessary to complete the substantive crimes of robbery. Depriving someone of their freedom of movement by imprisoning them in a bathroom subsequent to acquiring their money, although convenient for the robber, is not inherent in the crime of robbery. It is crystal clear that the petitioner's intent and purpose for locking up his robbery victims [were] to postpone their summoning of assistance and reporting of the crime to [the] police, thus facilitating the petitioner's escape from the scene and delaying detection of his crime, identity, and/or whereabouts. Also, the petitioner extended the period of infliction of duress and distress for the victims by restraining them beyond the time of fulfillment of his quest, [that is, his] seizure of cash." (Emphasis in original.)

Banks *v.* Commissioner of Correction

The habeas court granted the petitioner's petition for certification to appeal, and a divided panel of the Appellate Court reversed. *Banks* v. *Commissioner of Correction*, supra, 184 Conn. App. 132. The Appellate Court majority, applying the *Neder* harmless error standard, determined that the absence of a *Salamon* instruction was not harmless beyond a reasonable doubt. Id., 104, 132; see id., 112–13 n.7. Specifically, the majority, applying the six factor test that we set forth in *State* v. *Salamon*, supra, 287 Conn. 548, concluded that three of the factors tipped in the petitioner's favor; see *Banks* v. *Commissioner of Correction*, supra, 130; and that a jury reasonably could have found that his movement and restraint of the four victims were part of "a continuous, uninterrupted course of conduct related to the robberies . . . ." Id., 132.

Judge Keller penned a dissenting opinion. See id., 132–50 (*Keller J.*, dissenting). She argued that five of the six *Salamon* factors pointed in the respondent's favor and that no reasonable jury could conclude that the petitioner's forcing his victims into an isolated bathroom at gunpoint, after having taken their valuables and emptied the cash registers, was merely incidental to and necessary for the commission of the robberies. Id., 143–50 (*Keller, J.*, dissenting).

We granted the respondent's petition for certification to appeal, limited to the following two issues: (1) "When a habeas petitioner claims that the criminal trial court erred by omitting jury instructions on the intent element of kidnapping pursuant to [*Salamon*], is harm measured in accordance with [*Brecht*] or [*Neder*]?" And (2) "[d]id the Appellate Court [correctly] conclude that the absence of a *Salamon* instruction at the petitioner's criminal trial was not harmless error?" *Banks* v. *Commissioner of Correction*, 330 Conn. 950, 197 A.3d 391 (2018). Additional facts will be set forth as necessary.

Banks *v.* Commissioner of Correction

II

We begin by addressing the first certified question, that is, whether the *Brecht* standard or the *Neder* standard applies to *Salamon* claims raised in habeas proceedings. We agree with the respondent that the *Brecht* standard, as defined herein, is applicable.

A

Under *Neder*, which adopted the *Chapman* standard; see *Chapman* v. *California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); the state must demonstrate that a trial error was harmless beyond a reasonable doubt. See *Neder* v. *United States*, supra, 527 U.S. 15. In the context of a criminal conviction in which the trial court failed to instruct the jury on an element of the charged offense, the *Neder* standard often has been framed as also requiring that the element at issue have been uncontested at trial, and that the evidence tending to establish that element be overwhelming, before an error may be deemed harmless. See, e.g., *State* v. *Velasco*, 253 Conn. 210, 232, 751 A.2d 800 (2000). The federal courts apply *Neder* to assess the harmlessness of most constitutional errors on direct review. See, e.g., *Neder* v. *United States*, supra, 7.

By contrast, under *Brecht*, the harmlessness of constitutional errors is assessed according to whether the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." (Internal quotation marks omitted.) *Brecht* v. *Abrahamson*, supra, 507 U.S. 637. This standard originated as the *Kotteakos* test. See *Kotteakos* v. *United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). It has been adopted as the harmless error standard for nonconstitutional errors by the federal courts and, more recently, by this court in *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006), overruled on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008). See *State*

Banks *v.* Commissioner of Correction

v. *Sawyer*, supra, 357 (nonconstitutional evidentiary error is harmless if ''an appellate court has a fair assurance that the error did not substantially affect the verdict'' (internal quotation marks omitted)). *Brecht* also is the standard by which the harmfulness of most constitutional errors is assessed in federal habeas actions.

The *Brecht* standard reserves the remedy of a new trial for errors resulting in '' 'actual prejudice,' '' as distinguished from errors giving rise to a mere possibility of harm. *Brecht* v. *Abrahamson*, supra, 507 U.S. 637. We previously have likened the substantial prejudice necessary for relief from nonconstitutional error to error that is sufficiently prejudicial ''to undermine confidence in the fairness of the verdict.'' (Internal quotation marks omitted.) *State* v. *Sawyer*, supra, 279 Conn. 353; see also id., 352–54 (citing cases in which this court has applied ''undermine confidence'' test for purposes of determining harmfulness of nonconstitutional error). Notably, this is the same showing—characterized as a showing of a reasonable probability of a different result—required for constitutional claims alleging ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and the suppression of material, exculpatory evidence under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The United States Court of Appeals for the Second Circuit has explained that, when *Brecht* is applied to a trial error in which the jury is not properly instructed as to an essential element of the charged crime, the reviewing court must undertake a careful, de novo review of the entire record and order a new trial unless the court is persuaded ''that a properly instructed, rational jury would have found the [required element of the crime proven] beyond a reasonable doubt.'' *Peck* v. *United States*, 106 F.3d 450, 456–57 (2d Cir. 1997).

Banks *v.* Commissioner of Correction

Although some courts expressly place the burden of demonstrating harmlessness under *Brecht* on the state, the United States Supreme Court has expressed the view that it is "conceptually clearer" simply to place the onus on the reviewing court to determine whether an error substantially influenced the jury's decision. *O'Neal* v. *McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995); see id., 436–37. We agree with the high court, however, that, when the reviewing court is in equipoise as to the question, the error must be deemed to have affected the verdict. See id., 435. For all intents and purposes, then, once a habeas petitioner has established a *Salamon* violation, the respondent bears the burden of demonstrating that the failure to instruct the jury in accordance with *Salamon* was harmless.

B

Although the petitioner argues that stare decisis requires us to apply *Neder*, in reality, this court never has resolved the question of whether *Salamon* errors should be assessed under *Neder* or *Brecht* on collateral review. Most of the *Salamon* cases that we have decided have reached us on direct review, where it is undisputed that *Neder* is the proper standard. Only twice have we had occasion to apply *Salamon* in the habeas context.

In the first case, *Luurtsema*, as we noted, the issue reached us in the context of reserved questions from the habeas court regarding the retroactive applicability of *Salamon*. *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 742 (plurality opinion). Accordingly, we did not have cause to address the harmless error issue. In dictum, however, we strongly suggested that *Brecht*—or at least something short of *Neder*— would be the appropriate legal standard. See id., 769–70 (plurality opinion). In *Luurtsema*, we explained why, in holding that *Salamon* applies retroactively on collateral

Banks *v.* Commissioner of Correction

review, we were not persuaded by the argument that
"a finding of retroactivity would flood the court system
with habeas petitioners seeking to overturn kidnapping
convictions . . . ." (Internal quotation marks omitted.)
Id., 769 (plurality opinion). We explained that, of those
potential habeas cases that "fall within the ambit of
*Salamon* . . . we expect that courts will be able to
dispose summarily of many cases [when] it is suffi-
ciently clear from the evidence presented at trial that
the petitioner was guilty of kidnapping, as properly
defined, [and] that any error arising from a failure to
instruct the jury in accordance with the rule in *Salamon*
was harmless." (Footnote omitted.) Id., 769–70 (plural-
ity opinion). The fact that we thought that many *Sala-
mon* cases could be disposed of summarily on the
ground of harmless error strongly suggests that we did
not envision that such claims would be evaluated under
the stringent *Neder* standard.

The second case—the only one in which we had the
opportunity to review a final judgment from a habeas
action finding a *Salamon* violation—was *Hinds* v. *Com-
missioner of Correction*, 321 Conn. 56, 136 A.3d 596
(2016). In that case, we expressly left open the question
of whether *Neder* or *Brecht* applies to *Salamon* claims
on collateral review. Specifically, after first having
found that the *Salamon* error was not harmless beyond
a reasonable doubt under *Neder*; id., 81; the majority
in *Hinds* stated that "this court has not had the occasion
to consider whether . . . a more stringent standard of
harm should apply in collateral proceedings . . . .
*Brecht* v. *Abrahamson*, supra, 507 U.S. 623 . . . ."
*Hinds* v. *Commissioner of Correction,* supra, 81. We
concluded, however, that "[w]e need not decide in
[*Hinds*] whether to enter the fray by adopting the stan-
dard in *Brecht* and the uncertainties that accompany it
. . . because . . . the petitioner would prevail even
under the more stringent standard . . . ." Id., 83. We

Banks *v.* Commissioner of Correction

then proceeded to explain at some length why the *Salamon* error in that case would qualify as harmful, even if we were to employ a standard more favorable to the respondent. See id., 83–94; see also *Epps* v. *Commissioner of Correction*, 323 Conn. 901, 150 A.3d 679 (2016) (granting certification to appeal to resolve question, "*unresolved by Hinds*," of "[w]hether . . . in a collateral proceeding, [when] the petitioner claims that the trial court erred by omitting an element of the criminal charge in its final instructions to the jury . . . harm [is] measured in accordance with *Brecht* . . . or . . . *Neder*" (emphasis added)).[4] Accordingly, we disagree with the petitioner's contention that precedent compels us to apply *Neder*. If anything, our prior case law suggests the opposite.

C

We conclude that *Brecht*, as characterized herein, provides the proper harmless error standard in state habeas actions, at least with respect to *Salamon* errors. We reach this conclusion for at least the following three reasons.

1

First, evaluating *Salamon* claims according to the *Brecht* standard is more consistent with how we handle other claims of error in habeas actions. The parties disagree as to which harmlessness standard is more consistent with our broader habeas jurisprudence, with each contending that adoption of the other party's preferred standard would create a " 'confused patchwork' " or draw "arbitrary distinctions . . . ." Because harmlessness standards vary depending on the stage of review and the type of error at issue, some appearance

---

[4] After granting certification to appeal, this court ultimately determined in *Epps* that certification had been improvidently granted and dismissed the respondent's appeal. See *Epps* v. *Commissioner of Correction*, 327 Conn. 482, 485, 175 A.3d 558 (2018).

20 OCTOBER, 2021 339 Conn. 1

Banks *v.* Commissioner of Correction

of arbitrariness, from some vantage point, is, perhaps, inevitable, regardless of which standard we adopt. See *United States* v. *Dominguez Benitez*, 542 U.S. 74, 86, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004) (Scalia, J., concurring in the judgment) ("[b]y my count, [the United States Supreme] Court has adopted no fewer than four assertedly different standards of probability relating to the assessment of whether the outcome of trial would have been different if [the] error had not occurred, or if omitted evidence had been included" (emphasis omitted)); *Brecht* v. *Abrahamson*, supra, 507 U.S. 649 (White, J., dissenting) ("[o]ur habeas jurisprudence is taking on the appearance of a confused patchwork").

It bears noting, however, that the vast majority of habeas cases that we review are subject to harmlessness or prejudice review under some standard that is more onerous, from the petitioner's standpoint, than *Chapman/Neder*. For example, many habeas cases present *Strickland* or *Brady* claims that require the *petitioner* to establish a reasonable probability that, but for the error, the result of the proceeding would have been different. See, e.g., *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 91–92, 52 A.3d 655 (2012).

The primary context in which we have required a showing of harmlessness beyond a reasonable doubt in habeas cases is when the prosecution knowingly has relied on or failed to correct false testimony at trial. See, e.g., *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 370–73, 71 A.3d 512 (2013). In those cases, we reasoned that a "strict standard of materiality is appropriate . . . not just because [the constitutional violations] involve prosecutorial [impropriety], but more importantly because they involve a corruption of the truth-seeking function of the trial process." (Internal quotation marks omitted.) Id., 372. Neither of those

rationales applies in the *Salamon* context, in which the state tried cases appropriately, according to our then established interpretation of the kidnapping statutes.

The first concurrence "see[s] no need for this standard to be 'consistent with how we handle other claims of error in habeas actions.' " Instead, the first concurrence contends that alleged *Salamon* errors are unique among habeas claims in that "[a] *Salamon* violation . . . is a determination that the state, in prosecuting a defendant, was unconstitutionally relieved of proving an essential element of the crime of kidnapping."

Although we are not bound by the federal courts in this regard, we find it noteworthy that they have roundly rejected the argument that we should carve out this particular category of constitutional error for review according to a different standard. In *California* v. *Roy*, 519 U.S. 2, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996), the United States Supreme Court confronted a scenario strikingly similar to that presented by our *Salamon* jurisprudence. One year after a California jury found the petitioner, Kenneth Roy, guilty of first degree murder on a theory of felony murder, the California Supreme Court clarified the state's felony murder law, holding that a stricter instruction on the intent element was required than the one that had been given in *Roy*. See id., 3, citing *People* v. *Beeman*, 35 Cal. 3d 547, 561, 674 P.2d 1318, 199 Cal. Rptr. 60 (1984). The United States Supreme Court agreed with the lower courts that, in light of *Beeman*, Roy had been convicted on the basis of a "misdescription of an element of the crime . . . ." (Internal quotation marks omitted.) *California* v. *Roy*, supra, 5. Nevertheless, the high court held that, not only was such an error not a structural error that defies analysis by harmless error standards; id.; but, on collateral review, it was subject to harmless error analysis under the *Brecht* standard rather than the *Neder* standard. See id., 5–6.

Banks *v.* Commissioner of Correction

Although *Roy* involved a federal collateral attack on a state conviction and, therefore, arguably was predicated in part on considerations of comity and federalism, its holding has been applied in habeas actions challenging federal convictions, where those concerns do not weigh in the balance. *Peck* v. *United States*, supra, 106 F.3d 450, a decision of the United States Court of Appeals for the Second Circuit, provides an excellent case in point. In *Peck*, as in *Roy* and *Salamon*, an intervening court decision—this time by the United States Supreme Court itself—meant that the habeas petitioner in that case had been found guilty by a jury that had not been properly instructed as to the intent element of the charged crime, namely, structuring cash transactions to evade bank reporting requirements in violation of various provisions of title 31 of the United States Code. Id., 451–53. The Court of Appeals, after reviewing its harmless error jurisprudence; id., 453–55; concluded that "*Brecht* sets forth the correct methodology for determining if an instructional error of the type present in *Roy* is harmless." Id., 456. As we discussed, the court emphasized that *Brecht* requires the reviewing court to undertake a careful, de novo review of the entire record; see id., 456–57; and to order a new trial unless the court is able to conclude "that a properly instructed, rational jury would have found the [required element of the crime proven] beyond a reasonable doubt." Id., 457.

Although we are free to diverge from the federal courts in defining the legal standards that govern appellate review of claims raised in state habeas petitions, we find *Roy* and *Peck* to be persuasive authority. As the respondent has argued, it is a close question whether the failure to give a *Salamon* instruction even constitutes error, let alone reversible error, in a case such as this, in which the conduct on which the kidnapping convictions were predicated did not occur until after

Banks *v.* Commissioner of Correction

the underlying robberies had been completed. By contrast, as the companion case demonstrates, the *Brecht* standard provides substantial protection and mandates a new trial when a reviewing court does not retain full confidence in the fairness of the conviction. See *Bell* v. *Commissioner of Correction*, supra, 339 Conn. 82, 83. Other types of constitutional errors likewise run the gamut, ranging from more minor, technical violations to serious deprivations of fundamental constitutional rights. We see no reason to add epicycle upon epicycle by carving out a special standard of review solely for one subset of habeas claims.

2

Second, a number of our sister states have followed the federal courts in adopting *Brecht* as the proper harmlessness standard for collateral review of constitutional errors. See, e.g., *White* v. *State*, 729 So. 2d 909, 915 (Fla. 1999); *State* v. *Thomas*, 750 So. 2d 1114, 1126 (La. App. 1999), writ denied, 795 So. 2d 1203 (La. 2001); *Sanchez* v. *State*, 272 Or. App. 226, 241 n.10, 355 P.3d 172, review denied, 358 Or. 449, 366 P.3d 719 (2015); *Ex parte Fierro*, 934 S.W.2d 370, 372 (Tex. Crim. App. 1996), cert. denied sub nom. *Fierro* v. *Texas*, 521 U.S. 1122, 117 S. Ct. 2517, 138 L. Ed. 2d 1019 (1997); see also *Hittson* v. *Humphrey*, Docket No. 5:01-CV-384 MTT, 2012 WL 5497808, *36 (M.D. Ga. November 13, 2012) (Georgia habeas court applied *Brecht*), rev'd in part on other grounds sub nom. *Hittson* v. *GDCP Warden*, 759 F.3d 1210 (11th Cir. 2014), cert. denied sub nom. *Hittson* v. *Chatman*, 576 U.S. 1028, 135 S. Ct. 2126, 192 L. Ed. 2d 887 (2015). We do not mean to suggest that *Brecht* is the prevailing approach among our sister states. A number of jurisdictions apply *Neder* on collateral as well as on direct review of constitutional errors. See, e.g., *In re Martinez*, 3 Cal. 5th 1216, 1224–25, 407 P.3d 1, 226 Cal. Rptr. 3d 315 (2017); *Guam* v. *Ojeda*, Docket No. CRA10-011, 2011 WL 6937376, *13 (Guam

Banks *v.* Commissioner of Correction

December 23, 2011); *Hill* v. *State*, 615 N.W.2d 135, 140–41 (N.D. 2000). Still, the fact that other states have adopted and successfully applied *Brecht* goes a long way toward addressing the potential counterarguments discussed hereinafter.

3

Third, and most important, insofar as *Brecht* requires that a new trial be granted due to the omission of a *Salamon* instruction unless, despite the omission, a reviewing court retains confidence in the fairness of the kidnapping conviction, the *Brecht* test affords a habeas petitioner significant protection. Indeed, under *Brecht*, a petitioner seeking a new trial because of such an omission is afforded no less protection than a petitioner who has established, under *Strickland*, that counsel's performance fell below constitutional standards, or, under *Brady*, that the state failed to turn over exculpatory information. In fact, a petitioner who, upon establishing a *Salamon* violation, is entitled to application of the *Brecht* standard actually will receive *more* protection than a petitioner seeking relief under *Strickland* or *Brady* because, as we have explained, the state bears the burden of disproving harm or prejudice. As in cases involving *Strickland* and *Brady* claims, if the appeals court, upon review of the petitioner's collateral attack on his conviction, is satisfied that the error—in this case the omission of a *Salamon* instruction—does not call into question the fairness of that conviction, then it seems clear that a new trial is not constitutionally required. Consequently, for the foregoing reasons, we conclude that, when a habeas petitioner convicted of kidnapping has demonstrated that the jury was not properly instructed in accordance with *Salamon*, the state meets its burden of establishing harmlessness only if the reviewing court, following a thorough, de novo review of the record, has confidence that a properly

Banks *v.* Commissioner of Correction

instructed jury would have found the defendant guilty beyond a reasonable doubt.

D

Several additional counterarguments have been asserted as to why we should assess the harmlessness of *Salamon* errors under *Neder*, even in habeas actions. For the following reasons, we ultimately do not find those arguments to be persuasive.

1

First, the petitioner and the first concurrence argue that to adopt the *Brecht* standard would be inconsistent with the rationales that animated our decisions in *Salamon* and *Luurtsema*. In *Brecht*, the United States Supreme Court offered three principal rationales for why a different harm standard should govern constitutional error in habeas actions than on direct appeal: (1) the presumption of finality following direct review of a conviction and the practical challenges that the state faces in potentially having to retry a petitioner years or—as in this case—decades after a crime; see *Brecht* v. *Abrahamson*, supra, 507 U.S. 633; (2) the extraordinary nature of the habeas remedy, which should be granted only to those petitioners who have been "grievously wronged and for whom belated liberation is little enough compensation" (internal quotation marks omitted) id., 633–34; and (3) concerns of federalism and comity, which counsel that federal courts defer to state courts that already have fully reviewed a petitioner's case and have found no reversible error. Id., 635; see also *Fry* v. *Pliler*, 551 U.S. 112, 117, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (discussing "primary reasons" for *Brecht* decision).

The petitioner argues that, as a general matter, the *Brecht* standard is not suitable for state habeas actions because the federalism and comity concerns on which

Banks *v.* Commissioner of Correction

*Brecht* was in part predicated do not apply when a state court is deciding a state habeas claim in the first instance. He further argues that *Brecht* is particularly ill-suited to the review of *Salamon* claims. He contends that, in *Salamon* and *Luurtsema*, we assumed that, although the finality of judgments is an important consideration, "the interests of finality must give way to the demands of liberty and a proper respect for the intent of the legislative branch." *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 766 (plurality opinion). Accordingly, he posits, we already have decided that the finality considerations addressed in *Brecht* are trumped by other considerations in the unique *Salamon* context. The first concurrence echoes these points.

This argument, while perhaps facially appealing, ultimately is unpersuasive. As we noted, two of the three principal rationales on which *Brecht* relied—the finality of judgments and the extraordinary nature of the habeas remedy—apply to state court habeas proceedings no less than to their federal counterparts. Moreover, subsequent to *Brecht*, the United States Supreme Court has downplayed the importance of the federalism and comity considerations discussed in that decision. Most notably, in *Fry*, the high court, resolving a split among the federal courts of appeals, held that *Brecht* is the proper standard for assessing harm in a federal habeas action, even when the state courts failed to recognize the constitutional error and did not review it for harmlessness under *Neder*. See *Fry* v. *Pliler*, supra, 551 U.S. 114, 121–22; see also *Davis* v. *Ayala*, 576 U.S. 257, 268, 135 S. Ct. 2187, 192 L. Ed. 2d 323 (2015) ("[t]he *Brecht* standard reflects the view that a [s]tate is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error" (internal quota-

Banks *v.* Commissioner of Correction

tion marks omitted)); *Calderon* v. *Coleman*, 525 U.S. 141, 146, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998) (finality concerns on which *Brecht* was predicated were especially compelling when seventeen years had passed since petitioner's sentencing). Indeed, in the wake of *Fry*, courts and commentators have opined that the finality and habeas specific concerns were the high court's principal rationales for adopting a less onerous harmless error standard in *Brecht*. See, e.g., *Hittson* v. *GDCP Warden*, supra, 759 F.3d 1276 (Carnes, C. J., concurring) ("Nothing in *Brecht* implies, let alone clearly establishes, that state courts must apply [*Neder*] on collateral review. If anything, *Brecht*'s principal rationale—that 'collateral review is different from direct review' and that the 'substantial and injurious effect' standard is 'better tailored to the nature and purpose of collateral review than the [*Neder*] standard'—implies that state courts, like federal courts, are not bound to apply the [*Neder*] standard when conducting collateral review. The . . . *Fry* decision took *Brecht* one step further away from [that] position . . . ."); 7 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 28.9 (b), pp. 382, 398 (most federal courts of appeals apply *Brecht* in habeas actions challenging federal convictions, despite inapplicability of federalism and comity concerns); J. Sullivan, "*Danforth*, Retroactivity, and Federalism," 61 Okla. L. Rev. 425, 497 (2008) ("in *Brecht* . . . the [c]ourt recognized that competing interests, including finality, warrant application of a different standard for proof of harm in evaluating claims of constitutional error asserted in federal habeas proceedings" (footnote omitted)). As we noted, a number of our sister state courts have adopted *Brecht* as the proper standard for assessing harmless error in state habeas actions, despite the inapplicability of the federalism and comity considerations discussed in that decision.

Banks *v.* Commissioner of Correction

We also reject the petitioner's contention that our cases already have struck the balance against the state's interests in preserving the finality of convictions. His argument confuses the existence of the right with the proper remedy for its violation. See *United States* v. *Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) ("the [*Brecht*] standard does not define the scope of underlying substantive constitutional rights . . . but is rather about what remedy is required [when] it is agreed that constitutional rights have been violated" (emphasis omitted)). In *Salamon*, we explained why our prior cases had not accurately construed Connecticut's kidnapping laws and how, upon a closer examination, it was clear that the legislature did not intend to criminalize as kidnapping conduct that was merely incidental to the commission of another crime, that is, conduct with no real independent criminal significance separate and apart from the underlying crime. See *State* v. *Salamon*, supra, 287 Conn. 542. In *Luurtsema*, we further explained why due process does not permit the continued incarceration of someone who has been convicted of a crime that he or she did not commit, as properly defined. See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 758–59 (plurality opinion). In that case, however, we also made clear that a habeas petitioner may not prevail on a *Salamon* claim when "continued incarceration would not represent a gross miscarriage of justice, such as [when] it is clear that the legislature did intend to criminalize the conduct at issue, if perhaps not under the precise label charged. In situations [in which] the criminal justice system has relied on a prior interpretation of the law so that providing retroactive relief would give the petitioner an undeserved windfall, the traditional rationales underling the writ of habeas corpus may not favor full retroactivity. See *Guzman* v. *Greene*, [425 F. Supp. 2d 298, 315 (E.D.N.Y. 2006), aff'd 337 Fed. Appx. 27 (2d Cir. 2009)] ('it is certainly not unjust, let

Banks *v.* Commissioner of Correction

alone manifestly unjust, to keep a murderer in jail’).’’ *Luurtsema* v. *Commissioner of Correction*, supra, 764 (plurality opinion). As we noted, we further emphasized in *Luurtsema* that reviewing courts will be able to summarily dispose of many *Salamon* errors as harmless. Id., 769–70 (plurality opinion). Accordingly, although we certainly have not treated finality as the be all and end all, we also have never said that the mere fact that a petitioner was found guilty of kidnapping by an improperly instructed jury necessarily amounts to reversible error.

2

A related argument advanced by the petitioner is that for us to apply *Brecht* in the present case, and to find the errors harmless because we conclude that the evidence presented at trial supports a kidnapping conviction under the proper definition of that crime, would be tantamount to directing a verdict for the state. The United States Supreme Court has expressly rejected this argument.

Only a small share of constitutional errors are structural, that is, so presumptively harmful that they require automatic reversal. See, e.g., *Washington* v. *Recuenco*, 548 U.S. 212, 218, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). Most, rather, are subject to harmless error review. See, e.g., id. (‘‘We have repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, most constitutional errors can be harmless.’’ (Internal quotation marks omitted.)). This includes errors in instructing the jury as to the elements of a crime. We have said this not only in *Luurtsema* and other *Salamon* cases, but also in numerous other contexts. See, e.g., *State* v. *Thompson*, 305 Conn. 806, 817–18, 48 A.3d 640 (2012) (erroneous instruction concerning circumstances under which jury properly could

Banks *v.* Commissioner of Correction

aggregate value of stolen property for purpose of determining whether state had proven element of offense of first degree larceny requiring theft of property worth more than $10,000); *Small* v. *Commissioner of Correction*, 286 Conn. 707, 726–29, 946 A.2d 1203 (court improperly failed to instruct jury on definition of "attempt," even though petitioner was charged with felony murder predicated on, inter alia, attempted robbery), cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008); *State* v. *McDonough*, 205 Conn. 352, 354–62, 533 A.2d 857 (1987) (erroneous instruction concerning inferences jury reasonably might draw from circumstantial evidence), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988). Indeed, *Neder* itself stands for the proposition that the omission of a single element of a crime from the jury charge is not a structural constitutional error that is exempt from harmless error analysis. *Washington* v. *Recuenco*, supra, 218–19; *Lanier* v. *United States*, 220 F.3d 833, 838 (7th Cir.), cert. denied, 531 U.S. 930, 121 S. Ct. 312, 148 L. Ed. 2d 250 (2000). Accordingly, the well established rule that a *trial* court may not direct a verdict of guilty in a criminal trial; *State* v. *Ubaldi*, 190 Conn. 559, 573, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see General Statutes § 54-89; in no way implies that a *reviewing* court cannot adjudge a *Salamon* error harmless when the evidence presented at trial, assessed under the appropriate legal standard, compels such a conclusion. See *Washington* v. *Recuenco*, supra, 220–22 (rejecting argument that subjecting trial court's failure to submit sentencing factor to jury to harmless error analysis amounted to improper directed verdict of guilty); *Neder* v. *United States*, supra, 527 U.S. 17–19 (same, with respect to failure to properly instruct jury as to elements of crime charged).

Banks *v.* Commissioner of Correction

3

The petitioner's next argument against adopting *Brecht* as the standard for assessing the harmlessness of *Salamon* errors on habeas review is that the *Brecht* standard is vague and not easily applied. Most of the cases on which the petitioner relies for this proposition, however, were decided in the mid-1990s, in the immediate aftermath of the *Brecht* decision. Since that time, the United States Supreme Court has provided additional guidance, clarifying several of the key ambiguities left open in *Brecht* itself.[5] See, e.g., *O'Neal* v. *McAninch*, supra, 513 U.S. 435–37 (resolving burden of proof questions); see also *Fry* v. *Pliler*, supra, 551 U.S. 121–22 (clarifying that *Brecht* applies on federal habeas review, regardless of whether state courts recognized error and reviewed it for harmlessness beyond reasonable doubt). Perhaps most significant, the *Brecht* test, as characterized herein, is the same familiar standard—namely, whether the error undermines confidence in the conviction—used for ascertaining prejudice under *Strickland* and *Brady*, a standard that we are called on to apply regularly. We do not expect that it will be unduly difficult to apply that standard in ascertaining the harm caused by an omitted *Salamon* instruction when that task is undertaken with due regard for the broader context of our holding in *Salamon*, that is, to ensure that a defendant is not convicted of kidnapping unless the conduct at issue has criminal significance independent of the underlying offense.

_____

[5] As Justice Scalia noted in his concurring opinion in *Dominguez Benitez*, we also would observe that the very same critique can be leveled with respect to the other standards of prejudice/harmless error that we regularly apply. See *United States* v. *Dominguez Benitez*, supra, 542 U.S. 86–87 (Scalia, J., concurring in the judgment) ("Such ineffable gradations of probability seem to me quite beyond the ability of the judicial mind (or any mind) to grasp, and thus harmful rather than helpful to the consistency and rationality of judicial [decision making]. That is especially so when they are applied to the hypothesizing of events that never in fact occurred. Such an enterprise is not [fact-finding], but closer to divination.").

Banks *v.* Commissioner of Correction

4

Finally, the first concurrence asserts that to apply *Brecht* in the present case would be unfair to the petitioner and to others similarly situated. That this court opted to revisit and revise our interpretation of the state's kidnapping laws following his conviction is no more the fault of the petitioner than of the state. Although would-be offenders were on notice in 1995 that they could be charged with kidnapping solely on the basis of the restraint inherent in robberies or assaults, they, like the state, did not have any reason to try their cases with the *Salamon* distinction in mind. Moreover, it may seem discrepant to assess the impact of the instructional error according to the more forgiving *Brecht* standard when, if we had decided *Salamon* one decade earlier, while the petitioner's direct appeal was pending, the state would have borne the burden of proving that the error was harmless beyond a reasonable doubt.

As we discussed, the somewhat scattershot nature of harmless error jurisprudence, with standards varying by the type of error at issue, the stage of review, and the jurisdiction in which the claim is reviewed, means that whichever standard we apply to *Salamon* errors in state habeas cases may appear to be unfair or incongruous from one vantage point or another. It certainly will not seem unjust from the respondent's standpoint to require a showing that there is some reasonable likelihood that the failure to give the jury a *Salamon* instruction had a substantial and injurious effect or influence on the outcome before requiring the state to retry the petitioner for crimes that were committed more than twenty-five years ago. If the ultimate question is how to allocate the risk that an appellate court will revise its interpretation of a criminal statute such as § 53a-92 after a conviction has been obtained and affirmed on direct appeal, we think that the fairest and

Banks *v.* Commissioner of Correction

most reasonable approach is to adopt the *Brecht* standard, as defined herein, to tip the balance in favor of the petitioner in close cases, and to evaluate the facts of a particular case with an eye toward whether there is a reasonable likelihood that the petitioner could and would have presented a different and potentially successful defense with the benefit of *Salamon*'s guidance. This avoids bestowing a windfall on the petitioner but also does not penalize him for failing to anticipate our reinterpretation of the kidnapping statute.[6]

## III

## A

Having concluded that the harm associated with depriving the petitioner of a *Salamon* instruction should

---

[6] The first concurrence also queries, first, why it is necessary to decide by which standard to assess the harmfulness of *Salamon* errors on collateral review and, second, whether it is fair to apply *Brecht* in the petitioner's case when our trial courts and the Appellate Court, acting without the benefit of this opinion, have in the past applied *Neder* to other petitioners' *Salamon* claims. The short answer to the first question is that it ordinarily is the duty of this court to clarify the law when called on to do so in the context of a justiciable case. In the present case, the respondent contends that the Appellate Court has applied the incorrect harmless error standard, and this court granted certification to address that question. *Banks* v. *Commissioner of Correction*, 330 Conn. 950, 197 A.3d 391 (2018). Although it is true that, on rare occasion, we refrain, for prudential reasons, from resolving a legal question that is squarely and properly before us, that is the exception rather than the rule, and we perceive no compelling reason why we should shrink from our duty in this instance. The fact that today's ruling potentially may impact a relatively small universe of future cases surely does not justify a failure to resolve the certified question, especially as the companion case itself demonstrates the broad range of configurations in which *Salamon* claims may present themselves.

We are no more troubled by the first concurrence's second charge. It is not at all uncommon for courts of last resort—the United States Supreme Court not least among them—to allow difficult legal questions to percolate in the lower courts for some time before ultimately resolving them. This, and the very nature of our judicial system, means that appellate tribunals frequently will resolve legal controversies in novel ways, such that future litigants are subject to rules different from those that bound past litigants. Far from unfair, this is the very essence of the common law. To hold ourselves yoked to a legal rule simply because the lower courts previously

Banks *v.* Commissioner of Correction

be assessed under the *Brecht* standard, we turn now to the second question in this appeal: whether the largely undisputed facts that were presented at trial and credited by the jury satisfy the statutory definition of kidnapping, as clarified by this court, such that we are confident that a properly instructed jury would have found the petitioner guilty of kidnapping beyond a reasonable doubt notwithstanding the *Salamon* error.

We note at the outset that the question of whether conduct bears independent criminal significance as kidnapping is one of law. It is, of course, the function of the jury to find the relevant facts, including, ultimately, whether a crime was committed with the intent necessary to qualify as kidnapping, namely, the specific intent to prevent the victim's liberation and not simply to perpetrate the underlying crime. See *State* v. *Salamon*, supra, 287 Conn. 532, 547–48. At the same time, it is beyond cavil that it is the role of the judiciary to interpret the relevant statutes and to define, as a matter of law, what type of conduct constitutes kidnapping according to those statutes. See id., 529. As we explained in *Salamon*, a necessary corollary is that it falls to the courts to define the intent element of the crime of kidnapping; see id., 534–35; to delineate the ways in which kidnapping differs from coterminous crimes such as robbery and sexual assault; see id., 542; and to specify the factors that are relevant to that analysis; see id., 548; in light of our understanding of the legislative history of the kidnapping statutes and the policy objectives that animated their modern revision. See id., 542, 546.

As we explain more fully hereinafter; see part III B of this opinion; our prior cases addressed the *Salamon* issue and defined the relevant factors in the context

have applied it would be to turn the concept of controlling legal authority on its head. This we decline to do.

Banks *v.* Commissioner of Correction

of the restraint involved in an ongoing sexual and/or physical assault. We now confront a distinct and novel scenario—asportation and confinement to facilitate a perpetrator's escape following the completion of a robbery—in which we have not previously had cause to apply *Salamon,* and in which a different provision of the kidnapping statutes is at issue. Although it always will be for the jury to find the relevant facts and to determine whether the perpetrator had the requisite criminal intent, it falls to this court to define in the first instance how that criminal intent differs from the intent necessary to commit an underlying crime for this category of offenses, as well as how the factors that we have articulated and applied to assess harmless error in the sexual assault context operate in this novel arena. As we explained in *Salamon,* those questions ultimately are ones of legislative intent, framed by the history and policy rationales that animate the relevant statutes. See id., 529, 542.

B

We next consider the standards by which a reviewing court is to assess the harmfulness of a *Salamon* error in the context of a robbery in which the perpetrator moves and confines the victims after having forcibly taken valuables in their possession. For the reasons that follow, we are not persuaded by the reasoning of the Appellate Court majority, which concluded that a jury reasonably might find that the restraint and asportation involved in the present case were undertaken as part of ongoing robberies and, therefore, that the petitioner might not have intended to restrain the victims more than was necessary to carry out those robberies. See *Banks* v. *Commissioner of Correction,* supra, 184 Conn. App. 124–25, 131–32.

1

First, there is the matter of the statute at issue. In *Salamon,* the defendant was convicted of violating

Banks *v.* Commissioner of Correction

§ 53a-94 (a), which provides that "[a] person is guilty of kidnapping in the second degree when he abducts another person." See also *State* v. *Salamon*, supra, 287 Conn. 529–30 (explaining distinction between kidnapping, which requires abduction, and lesser offense of unlawful restraint, which merely requires restraint). Most of our subsequent *Salamon* cases have involved violations of that statute; e.g., *State* v. *Fields*, 302 Conn. 236, 238, 24 A.3d 1243 (2011); or of § 53a-92 (a) (2) (A), which provides that "[a] person is guilty of kidnapping in the first degree when he abducts another person and . . . he restrains the person abducted with intent to . . . inflict physical injury upon him or violate or abuse him sexually . . . ." E.g., *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 59; *State* v. *Ward*, 306 Conn. 718, 721, 51 A.3d 970 (2012); *State* v. *Hampton*, supra, 293 Conn. 437–38; *State* v. *DeJesus*, supra, 288 Conn. 420. All of those cases involved allegations that the alleged kidnapping was intertwined with a sexual or physical assault.

The present case, by contrast, requires that we construe General Statutes § 53a-92 (a) (2) (B), which provides that "[a] person is guilty of kidnapping in the first degree when he abducts another person and . . . he restrains the person abducted with intent to . . . accomplish or advance the commission of a felony . . . ."[7]

As we concluded in *Salamon* with respect to the underlying crime of assault; see *State* v. *Salamon*, supra,

---

[7] We note that one of our *Salamon* cases, namely, *State* v. *Flores*, 301 Conn. 77, 79, 17 A.3d 1025 (2011), did involve an underlying robbery and a conviction under § 53a-92 (a) (2) (B). In that case, we concluded that the lack of a *Salamon* instruction was not harmless error because, among other things, the victim was released immediately after the defendant forcibly took her property and the state did not argue that the restraint occurred for any longer than was necessary to commit the robbery. Id., 85, 87. For that reason, *Flores* is readily distinguishable from the present case.

Banks *v.* Commissioner of Correction

287 Conn. 542; it is clear that the legislature did not intend to criminalize as kidnapping unlawful restraint that is no greater than necessary for, and involves no wrongful intent other than that inherent in, the completion of a robbery. It is equally clear, however, that the legislature, in adopting § 53a-92 (a) (2) (B), *did* intend that additional, gratuitous restraint used to accomplish or advance the commission of a robbery carry the added penalties associated with kidnapping. In other words, the mere fact that a perpetrator restrains a victim during the course of and in the service of a robbery does not mean that, under *Salamon*, the conduct does not constitute kidnapping. To so hold—or to permit a jury to so reason—would be to render § 53a-92 (a) (2) (B) a nullity, insofar as that statute criminalizes only such kidnappings. See *State* v. *Buggs*, 219 Kan. 203, 214, 547 P.2d 720 (1976) (construing similar Kansas statute).

Accordingly, we are not persuaded by the reasoning of the Appellate Court majority that a jury reasonably might find that the petitioner's conduct was not kidnapping merely because it occurred as part of the course of events of the robberies. See *Banks* v. *Commissioner of Correction*, supra, 184 Conn. App. 124–25, 131–32. As Judge Keller explained in her dissent and Judge Lavine in his dissent in the companion case, that is not the relevant legal inquiry. See id., 133 n.1, 145 n.6 (*Keller, J.*, dissenting); see also *Bell* v. *Commissioner of Correction*, 184 Conn. App. 150, 183 n.5, 194 A.3d 809 (2018) (*Lavine, J.*, dissenting), aff'd, 339 Conn. 79,     A.3d     (2021). Rather, under *Salamon*, a jury, having found abduction, restraint, and the criminal intent associated therewith in the furtherance of a robbery, will necessarily find the petitioner guilty of kidnapping under § 53a-92 (a) (2) (B) *unless* it also finds that the restraint, and the associated criminal intent, was limited to that *inherent* in the robbery itself. As we explain in the discussion that follows, when the question for the jury

Banks *v.* Commissioner of Correction

is properly framed in that manner, only one answer is reasonably possible in view of the facts of the present case.

We find *Virgin Islands* v. *Ventura*, 775 F.2d 92 (3d Cir. 1985), to be instructive in this regard. In that case, the United States Court of Appeals for the Third Circuit construed a territorial statute that provided that "[w]hoever abducts, takes or carries away any person by force or threat with the intent to commit rape is guilty of kidnapping . . . ." Id., 96, quoting Act of June 30, 1983, No. 4838, 1983 V.I. Sess. Laws 100, 101 (codified at V.I. Code Ann. tit. 14, § 1052 (b)). As has this court; see, e.g., *State* v. *Salamon*, supra, 287 Conn. 548; the Third Circuit, in *Virgin Islands* v. *Berry*, 604 F.2d 221, 227 (3d. Cir. 1979), previously had applied a multifactor test to assess when, as a general matter, an alleged kidnapping committed in conjunction with another crime constitutes a discrete offense. In *Ventura*, however, the Third Circuit held that the fact that the legislature chose to specifically criminalize asportation incident to rape after *Berry* was decided meant that, with respect to cases falling under the new statute, certain factors of the test were necessarily satisfied and need not be considered on a case-by-case basis. See *Virgin Islands* v. *Ventura*, supra, 97 ("[t]o apply the *Berry* factor [at issue in *Ventura*] would effectively override the will of the Virgin Islands legislature"). Likewise, in the present case, to instruct a jury that it could find that there was no kidnapping merely because the restraint occurred in the course of an ongoing robbery would effectively override the will of our state's legislature, which was to impose heightened penalties for precisely such conduct.

2

Second, the decision of the Appellate Court in this case not only runs afoul of the statutory language, but

Banks *v.* Commissioner of Correction

also fails to take due account of the particular factual scenario presented by this case. This case is categorically distinct from all of our prior *Salamon* cases insofar as the petitioner indisputably had accomplished the criminal objective of his underlying crimes prior to the commencement of the alleged kidnapping. Under such circumstances, there simply is no concern that the intent of the legislature will be frustrated by prosecuting a defendant for kidnapping solely on the basis of the restraint inherent in or necessary to accomplish the underlying crime. Many if not most robbers choose to leave the scene immediately upon obtaining the fruits of their crime. Numerous sister state courts have concluded, as a matter of law, that a perpetrator's choice to remain at the crime scene and further restrict a victim's liberty after having robbed him or her manifests independent, criminal significance. See, e.g., *Black* v. *State*, 630 So. 2d 609, 619 (Fla. App. 1993) (when restraint and removal occurred after perpetrator had taken money from store, court deemed it "obvious that the movement and confinement . . . [were] not inherent in the nature of the robbery . . . [but] had some significance independent of the robbery" (internal quotation marks omitted)), review denied, 639 So. 2d 976 (Fla. 1994); *State* v. *Blouvet*, 965 S.W.2d 489, 492 (Tenn. Crim. App. 1997) ("[h]olding [the victim] at gunpoint and moving her about the store [are] certainly not incidental to the already accomplished felony of aggravated robbery"); *State* v. *Allen*, 94 Wn. 2d 860, 864, 621 P.2d 143 (1980) (concluding that brief abduction that occurred after robbery to facilitate perpetrators' flight from scene was "a wholly separate event" and not incidental to robbery because "[n]either the flight from the scene of the robbery nor the means of flight therefrom [were] statutorily or logically . . . part of [the] robbery"), overruled on other grounds by *State* v. *Vladovic*, 99 Wn. 2d 413, 662 P.2d 853 (1983); see also *State* v.

*Golder*, 127 Conn. App. 181, 190–91, 14 A.3d 399 (when defendant moved victim to different room and restrained her therein to facilitate his escape after taking her jewelry, restraint bore independent criminal significance from completed burglary), cert. denied, 301 Conn. 912, 19 A.3d 180 (2011); *People* v. *Bautista*, 147 App. Div. 3d 1214, 1218, 47 N.Y.S.3d 503 (2017) ("a kidnapping is generally deemed to merge with another offense . . . [when] there is minimal asportation immediately preceding the other crime or [when] the restraint and underlying crime are essentially simultaneous" (internal quotation marks omitted)).

Although we have not yet had occasion to expressly state this proposition, we implied it in two prior cases. In *State* v. *Fields*, supra, 302 Conn. 236, we addressed the state's contention that the defendant was not entitled to a new trial on the challenged kidnapping count because the alleged kidnapping did not occur until after the assault of the victim had been completed. See id., 251. We indicated that "[w]e might agree with this contention" had the factual premises for the state's argument not been in dispute. Id. Subsequently, in *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 56, we distinguished certain cases from other jurisdictions that held the lack of a *Salamon*-type instruction to be harmless error because those cases involved "continued restraint after completion of the nonkidnapping offenses . . . ." Id., 87.

This makes sense. There is nothing specific to—let alone inherent in—the crime of robbery about forcing someone at gunpoint to the back of a store and restraining them in a bathroom or cooler. That conduct could just as well follow, and facilitate the offender's escape from, a physical or sexual assault, or other crime. The purpose is to escape unhindered from a crime scene—which, presumably, is a goal of most crim-

inals—and the specific nature of the underlying crime is simply irrelevant.

3

The Appellate Court majority rejected the respondent's argument—and the conclusion of the habeas court—that the petitioner's asportation and restraint of his victims necessarily bore independent criminal significance because they did not commence until after the petitioner had accomplished his primary goal of obtaining wrongful possession of the cash in the store registers. See *Banks* v. *Commissioner of Correction*, supra, 184 Conn. App. 114, 120. The majority reasoned that, according to some authorities, a robbery is not necessarily completed at the time that a perpetrator obtains unlawful possession of a victim's property and, therefore, that force exercised after the petitioner had taken the victims' money reasonably could be considered to be incidental to the robberies. See id., 120–28.

Judge Keller responded, and we agree, that we need not engage in an "unduly legalistic" analysis of the precise moment at which a robbery ends. Id., 148 (*Keller, J.*, dissenting). Regardless of whether the robberies can be said to have been ongoing in some sense, even after the petitioner took possession of the victims' money, the important point for present purposes is that any movement and confinement imposed after that time served a fundamentally different objective. Whether this category of restraints implicates the concerns that we addressed in *Salamon* and, more broadly, whether they are of the type that the legislature intended to independently criminalize are questions of law that fall to this court to resolve.

C

Both the Appellate Court majority, in concluding that the *Salamon* error in the present case prejudiced the

Banks *v.* Commissioner of Correction

petitioner, and Judge Keller, in maintaining that it did not, contended that the six *Salamon* factors, on balance, tipped in favor of their positions. Id., 115–30; id., 143–50 (*Keller, J.,* dissenting). Those factors are (1) the nature and duration of the victim's movement or confinement, (2) whether that movement or confinement occurred during the commission of the separate offense, (3) whether the restraint was inherent in the nature of the separate offense, (4) whether the restraint prevented the victim from summoning assistance, (5) whether the restraint reduced the perpetrator's risk of detection, and (6) whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense. *State v. Salamon,* supra, 287 Conn. 548. We agree with Judge Keller that, in cases such as this, in which it is undisputed that the perpetrator unlawfully restrained his victims following, and to facilitate his escape from the location of, a robbery, the *Salamon* factors typically will tip against the petitioner's claim. But see footnote 14 of this opinion.

There is little dispute that the first *Salamon* factor— the extent of the victims' asportation and confinement—tends to favor the petitioner in the present case, as will often be true in cases of this ilk. See *Banks* v. *Commissioner of Correction,* supra, 184 Conn. App. 115–20 (comparing cases in which this court and Appellate Court concluded that conduct did, or did not, as matter of law, have independent criminal significance). That is to say, a jury reasonably could conclude that moving robbery victims fewer than ten yards and confining them for, at most, a few minutes during a perpetrator's escape from the crime scene does not, simply by virtue of the times and distances involved, bear independent criminal significance.

In the preceding discussion, we explained why the second and third *Salamon* factors ordinarily will tip

Banks *v.* Commissioner of Correction

against the petitioner in a postrobbery kidnapping scenario. The conduct at issue occurred after the objective of the robbery had been completed. Nor was it inherent in the crime of robbery, insofar as many, if not most, robberies end with the perpetrator's simply fleeing the premises rather than moving and confining the victims. In the discussion that follows, we explain why the final three *Salamon* factors also favor the respondent in such situations.

1

The parties, and the Appellate Court majorities and dissents, in both this case and the companion case, *Bell*, disagree as to how the *Salamon* factors are to be balanced and whether any of the six factors is dispositive. Although the relative importance of the various factors will vary depending on the context, we have made clear that the touchstone in any *Salamon* case, in assessing whether conduct associated with a rape, robbery, or assault has independent criminal significance as a kidnapping, is the intent of the offender. See *State* v. *Salamon*, supra, 287 Conn. 532 ("the proper inquiry for a jury evaluating a kidnapping charge is not whether the confinement or movement of the victim was minimal or incidental to another offense against the victim but, rather, whether it was accomplished with the requisite intent, that is, to prevent the victim's liberation"); id., 534 (intent element is what defines abduction, the sine qua non of kidnapping); id., 542 ("to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation"). We have continued to emphasize this point in our subsequent *Salamon* cases. See, e.g., *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 90 ("the ultimate question [is] the perpetrator's *intent* in taking these actions" (emphasis in original)); *State* v. *Fields*, supra, 302 Conn. 247 (referring to *Salamon* instruction as "incidental intent instruction"); *State* v. *Winot*, 294

Banks *v.* Commissioner of Correction

Conn. 753, 762, 988 A.2d 188 (2010) ("we repeatedly [have] explained [that] the touchstone for determining whether the movement or confinement at issue constituted kidnapping was not its extensiveness, but rather, whether it was accomplished with the requisite intent" (internal quotation marks omitted)). The fourth and fifth *Salamon* factors—whether the restraint prevented the victim from summoning assistance or reduced the perpetrator's risk of detection—must be understood in that light.

In a scenario such as this, in which the perpetrator removes the victims from the scene of the robbery and restrains them after having forcibly taken their property, we agree with the respondent that the fourth and fifth *Salamon* factors are the ones that speak most directly to the intent of the perpetrator. The goal of a robbery is to take possession of another's property. Once that property has been taken by force, the purpose of leading the victims to a different, more isolated location and requiring that they remain there for some period of time is, undoubtedly, to facilitate the offender's escape from the premises, undetected and unobstructed. The Kansas Supreme Court put the point most succinctly: "The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is." *State* v. *Buggs*, supra, 219 Kan. 216. Indeed, sister state courts have found it apparent that restraining robbery victims after having taken their property bespeaks an independent criminal intention to facilitate escape without detection or apprehension. See, e.g., *Miles* v. *State*, 839 So. 2d 814, 820 (Fla. App. 2003).

Nothing in the record of the present case suggests that a different result is warranted. Silk provided the only direct evidence regarding the petitioner's rationale for forcing his victims into the bathrooms after robbing them. In response to the question "what was the pur-

Banks *v.* Commissioner of Correction

pose in your going into the bathroom,'' Silk answered: ''I would say just so he could get away.''[8] The petitioner has not been able to articulate any other plausible rationale for his postrobbery treatment of the victims other than to facilitate his escape, and none is apparent.[9] In cases involving strikingly similar fact patterns, sister state courts have had no difficulty concluding that the purpose for secreting and restraining robbery victims after taking their property is to facilitate the perpetrator's escape. See, e.g., *Ferguson* v. *State*, 533 So. 2d 763, 764 (Fla. 1988) (forced confinement of restaurant employees in restroom after robbery was ''intended to make it more difficult for the victims to identify the perpetrator and immediately call for help''); *Richardson* v. *State*, 875 So. 2d 673, 678 (Fla. App. 2004) (confining convenience store clerk in back freezer room after taking money from cash register ''facilitated the robbers' flight from the crime scene . . . and substantially lessened the risk of quick detection''); *State* v. *Buggs*, supra, 219 Kan. 215–16 (restraint or asportation that substantially lessens risk of detection is sufficient to constitute kidnapping). We conclude, then, that the fourth and fifth *Salamon* factors also tip in the respondent's favor.

2

Turning to the sixth *Salamon* factor, we also agree with the respondent that shepherding a victim at gunpoint into a back room of a retail establishment after having robbed her invariably ''create[s] a significant

___

[8] There also was testimony that the petitioner originally sought to force his victims into the basement, which would have further isolated them, until he was informed that the stores had no basement.

[9] Indeed, in his brief to this court, the petitioner essentially acknowledges that the victims were forced into the bathroom to facilitate his escape, stating that ''it is conceivable that jurors would view the fact that [the] petitioner moved the employees into the bathrooms *so that he could escape* as being part and parcel of the robberies.'' (Emphasis added.)

Banks *v.* Commissioner of Correction

danger or increase[s] the victim's risk of harm independent of that posed by the separate offense.'' *State* v. *Salamon*, supra, 287 Conn. 548. In *Salamon*, we suggested that the distinct danger that is relevant to the question of whether criminal conduct bears independent significance as kidnapping need not be physical danger. See id., 536. Criminal conduct that inspires distinct fears or has a uniquely harmful psychological impact on the victim also qualifies. See id. (''[a]mong the evils that both the common law and later statutory prohibitions against kidnapping sought to address were the isolation of a victim from the protections of society and the law and the special fear . . . inherent in such isolation''). Other courts and commentators have reached the same conclusion. See, e.g., *People* v. *Nguyen*, 22 Cal. 4th 872, 886, 997 P.2d 493, 95 Cal. Rptr. 2d 178 (2000) (holding that conduct that substantially increases risk of psychological trauma to victim is legitimate basis for finding separate offense); 2 A.L.I., Model Penal Code and Commentaries (1980) § 212.1, p. 222 (discussing unique evil of kidnapping as means of terrorizing victim).

Isolating and restraining victims at gunpoint after having robbed them causes them to experience fears that are different both in degree and in kind from the fears that naturally accompany being robbed. This is especially true in a highly visible commercial setting. When a retail store or restaurant is robbed, the victim reasonably may expect that the perpetrator will release her and flee the premises as soon as he has taken the property, bringing the danger to an end. When a perpetrator opts to restrain a victim after a commercial robbery rather than leaving the premises, however, the victim justifiably fears that her ordeal may be just beginning. See, e.g., *Latimore* v. *Barnes*, Docket No. C11-5527 (SBA), 2015 WL 1406904, *2 (N.D. Cal. March 27, 2015).

Banks *v.* Commissioner of Correction

The case books are filled with instances in which a robber restrains, isolates, and/or moves his victims after taking their money as a prelude to committing additional, more dangerous crimes. The robbery victim who is led at gunpoint away from the visibility of a commercial storefront understands that the offender may be isolating and restraining her not merely to facilitate his escape but as a prelude to a physical assault,[10] sexual assault,[11] use of the victim as a hostage or human shield,[12] or even murder.[13] The prospect is undeniably terrifying. See, e.g., *Commonwealth* v. *Hughes*, 264 Pa. Super. 118, 126, 399 A.2d 694 (1979); N. Kanellis, Note, "Kidnapping in Iowa: Movements Incidental to Sexual Abuse," 67 Iowa L. Rev. 773, 782 (1982).

It is undisputed that the victims in the present case did in fact experience such heightened and distinct psychological harm as a result of their postrobbery asportation and restraint. One of the victims, Feltman, testified that she feared for her life during the kidnapping. Another, Kozlowski, testified that he ducked down while imprisoned in the bathroom for fear that the petitioner would shoot him through the door. Defense counsel conceded as much in his closing argument, acknowledging that "all four victims had a very hard experience. . . . I will concede for you that . . . Wright and . . . Feltman had probably the most difficult . . . harshest, the most traumatic experiences of their [lives] . . . ."

[10] See, e.g., *People* v. *Shay*, 60 App. Div. 2d 698, 698, 400 N.Y.S.2d 383 (1977).

[11] See, e.g., *Lovette* v. *State*, 636 So. 2d 1304, 1305–1306 (Fla. 1994); *Mills* v. *State*, 236 Ga. 365, 365, 223 S.E.2d 725 (1976); *State* v. *Coleman*, 865 S.W.2d 455, 456 (Tenn. 1993).

[12] See, e.g., *State* v. *Vue*, Docket No. C4-92-86, 1992 WL 153093, *2 (Minn. App. July 7, 1992); *People* v. *Addison*, 151 App. Div. 2d 372, 372, 543 N.Y.S.2d 74, appeal denied, 74 N.Y.2d 946, 549 N.E.2d 483, 550 N.Y.S.2d 281 (1989), and appeal denied, 74 N.Y.2d 946, 549 N.E.2d 483, 550 N.Y.S.2d 281 (1989).

[13] See, e.g., *Lovette* v. *State*, 636 So. 2d 1304, 1305–1306 (Fla. 1994); *State* v. *Robinson*, Docket No. 01C01-9207-CR-00234, 1993 WL 273953, *3 (Tenn. Crim. App. July 22, 1993).

Banks *v.* Commissioner of Correction

Moreover, the harms and dangers involved in a post-robbery kidnapping are not solely psychological. Even if the perpetrator does not plan to assault, imperil, or kill his victims following a robbery, spiriting them at gunpoint to a more isolated location necessarily increases the risk that they will suffer serious physical injury or death. See, e.g., *Eaglehorse* v. *State*, 286 N.W.2d 329, 331 (S.D. 1979); see also Note, "A Rationale of the Law of Kidnapping," 53 Colum. L. Rev. 540, 547–48 (1953). As the Supreme Court of California has explained, "[i]t takes but little imagination to envision the kind of violent events whose likelihood of occurrence is great [when a kidnapping victim is forced to travel a great distance under the threat of injury by a deadly weapon]. Ready examples include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties." *People* v. *Lara*, 12 Cal. 3d 903, 908 n.4, 528 P.2d 365, 117 Cal. Rptr. 549 (1974); see, e.g., *Latimore* v. *Barnes*, supra, 2015 WL 1406904, *4 (in assessing whether restraint constitutes independent crime of "kidnapping to commit robbery," jury considers "whether the movement increased a victim's risk of harm . . . [including] the danger inherent in a victim's foreseeable attempts to escape" (internal quotation marks omitted)); N. Kanellis, supra, 67 Iowa L. Rev. 782 ("[t]aking a victim from familiar surroundings to an unknown location . . . may aggravate the victim's [freedom seeking] impulses, causing the victim to attempt an escape and thus possibly incur more serious bodily harm" (footnote omitted)). Once again, one need not look far to find cases in which a victim, fearing that kidnapping would be a precursor to rape, assault, or murder, panicked or tried to resist, bringing about a tragic, self-fulfilling prophesy. See, e.g., *People* v. *Laursen* 8 Cal. 3d 192, 196, 501 P.2d 1145, 104 Cal. Rptr. 425 (1972) (motorist was shot when resisting kidnapping during escape from

Banks *v.* Commissioner of Correction

robbery), appeal dismissed and cert. denied, 412 U.S. 915, 93 S. Ct. 2738, 37 L. Ed. 2d 142 (1973); *Johnson* v. *State*, 281 Ga. App. 7, 8, 635 S.E.2d 278 (2006) (when robbery victim resisted being locked in camper, defendant struck him in head with revolver, causing him to fade in and out of consciousness).

3

When we examine the six *Salamon* factors, then, five of the factors most often will resolve in favor of the respondent when the perpetrator of a robbery forces his victims to leave the relative safety of a highly visible commercial store front and sequesters them in a more isolated area after having robbed them. The asportation and confinement take place after the completion of the primary objective of the robbery. The restraint is not inherent in the nature of the robbery, insofar as many, if not most, robberies culminate with the offender simply fleeing with the fruits of the robbery; leading a victim to a back room at gunpoint is no more linked to the crime of robbery than to rape, assault, or any other crime. Such removal and restraint typically are for the purpose of, and have the effect of, making it more difficult for the victim to summon assistance and reducing the offender's risk of detection, if not a prelude to the commission of a distinct crime, such as a sexual assault. Finally, the conduct necessarily subjects the victim to unique risks and harms, both physical and psychological, beyond those inherent in the robbery itself. Under such circumstances, these five factors almost invariably will outweigh the first factor—the nature and duration of the movement and confinement—which is more subjective and fact based, and takes center stage in close cases such as *Salamon*.[14]

[14] We note that our conclusion that removing and restraining a victim after a robbery to facilitate the perpetrator's escape usually holds independent criminal significance does not mean that there could not be close cases in which the failure to submit the question to a jury would constitute prejudicial error. For example, we would hesitate to find harmless a trial court's failure

Banks *v.* Commissioner of Correction

D

Finally, we take this opportunity to clarify some of the language in *Salamon* and *Hinds* that has been a source of confusion among litigants and the lower courts, the present case included. Specifically, in *Salamon* we stated that "[o]ur legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are *merely incidental to and necessary for* the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is *necessary* to commit the other crime." (Emphasis added.) *State* v. *Salamon*, supra, 287 Conn. 542. Subsequently, in *Hinds*, in response to the dissenting justices, the majority explained that, "by focusing solely on whether there was any restraint or asportation beyond that necessary for the commission

to give the jury a *Salamon* instruction in a case in which the alleged postrobbery conduct involved no asportation and only minimal restraint, such as a parting order that the victim lie on the ground or "don't be a hero." See, e.g., *Hill* v. *State*, 642 So. 2d 796, 797–98 (Fla. App. 1994) (jury could find restraint was incidental to robbery when perpetrators merely forced victims to lie down on floor before escaping); *State* v. *White*, 362 S.W.3d 559, 562–63 (Tenn. 2012) (whether confinement was incident to robbery was question for jury when defendant, while leaving scene of robbery, removed telephones and directed victims to lie down on floor and wait eight or nine minutes). It is debatable, for example, whether the victims are placed at increased risk of harm under such circumstances. The present case, however, is fundamentally different from those cases. The petitioner took each victim at gunpoint to a different, more isolated part of the store, where he ordered them to remain confined in an enclosed space and attempted to block their escape.

Banks *v.* Commissioner of Correction

of the sexual assault, the dissenting justices ignore[d] the 'incidental to' language in *Salamon*. . . . Restraint may be incidental to a sexual assault that is not necessary for its commission." (Citations omitted; emphasis omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 89–90.

We did not invent the highlighted language in *Salamon*. Substantially similar articulations of the "incidental and necessary" test appeared in the decisions of many of our sister states prior to *Salamon*. See, e.g., *People* v. *Daniels*, 71 Cal. 2d 1119, 1139, 459 P.2d 225, 80 Cal. Rptr. 897 (1969); *Cejvanovic* v. *State*, Docket No. 05-1226, 2006 WL 3614067, *2 (Iowa App. December 13, 2006) (decision without published opinion, 728 N.W.2d 223); *State* v. *Robbins*, 272 Kan. 158, 175, 32 P.3d 171 (2001); *State* v. *Rogers*, 17 Ohio St. 3d 174, 181, 478 N.E.2d 984, vacated on other grounds, 474 U.S. 1002, 106 S. Ct. 518, 88 L. Ed. 2d 452 (1985); *State* v. *Atkin*, 135 P.3d 894, 898–99 (Utah App.), cert. denied, 150 P.3d 58 (Utah 2006); *State* v. *Harris*, Docket No. 55561-8, 2006 WL 2246194, *2 (Wn. App. August 7, 2006) (decision without published opinion, 134 Wn. App. 1029), review denied, 160 Wn. 2d 1015, 161 P.3d 1027 (2007). Nevertheless, that language, both on its own and in conjunction with the cited language in *Hinds*, has led to confusion about, first, what it means for force or restraint to be *necessary* to the commission of a rape, robbery, or assault, and, second, whether the incidental and necessary test is to be understood as conjunctive or disjunctive. That is, does *Salamon* apply only when an offender's conduct is not only incidental to but also necessary to commit the underlying crime, or is a defendant entitled to *Salamon*'s protections if either prong of the test applies (if, for example, restraint of the victim was incidental to a sexual assault but was not necessary to accomplish the assault). Both questions are front and center in the present case, in which the parties

Banks *v.* Commissioner of Correction

disagree over the proper application of the incidental and necessary test.

With respect to the meaning of the word "necessary," greater clarity may be achieved and ambiguities resolved by emphasizing three points often made by sister state courts. First, although restraint is not strictly necessary to accomplish a rape, robbery, or assault— restraint is not an essential element of those crimes— some degree of restraint, whether by physical force or threat and fear, almost always accompanies their commission. See *Frederick* v. *State*, 931 So. 2d 967, 970 (Fla. App. 2006); *State* v. *White*, 362 S.W.3d 559, 568 (Tenn. 2012). We have used the word "necessary" in that spirit.

Second, our statement that kidnapping requires prevention of the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the underlying crime does not mean that an offender must commit the underlying crime in the *least* intrusive manner lest he be subjected to criminal liability for kidnapping. *Hinds* itself is an excellent illustration of this point. We suggested in that case that if, for example, a jury concluded that the petitioner decided to move his victim the short distance from the parking lot where he abducted her to a nearby grassy area not to avoid detection or identification but, rather, because "he could not perform in the lit space [of the parking lot], or simply to avoid the hard paved surface while kneeling on the ground [as he assaulted her]"; *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 80; then there was no indication that our legislature intended to criminalize his conduct as kidnapping merely because the act might have been completed less intrusively. See id., 79–80.

Third, one complication of thinking about necessity in this manner is that doing so forces a reviewing court

Banks *v.* Commissioner of Correction

to confront thorny, angels on the head of a pin questions about the degree of restraint employed in any particular crime. Could an offender have accomplished a rape, robbery, or assault using less restraint? Would an underlying crime committed less intrusively have been the *same* crime?

To avoid having to confront these sorts of prickly metaphysical and counterfactual questions, sister state courts have framed the issue in terms of whether the restraint involved in a crime reflects a different criminal *intention* or creates a different *risk of harm* than that *necessarily* present in the underlying crime.[15] In other words, the jury looks not to whether each of the offender's specific physical actions was strictly necessary to commit the underlying crime but, instead, to whether his actions demonstrated an animus or purpose beyond that necessarily involved in the underlying crime (e.g.,

---

[15] See, e.g., *People* v. *Daniels*, supra, 71 Cal. 2d 1139 ("the intent of the [California] [l]egislature . . . was to exclude from [the] reach [of the felony kidnapping statute] not only standstill robberies . . . but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the *risk of harm over and above that necessarily present* in the crime of robbery itself" (citation omitted; emphasis added; internal quotation marks omitted)); *State* v. *Hartley*, Docket No. 90AP-859, 1991 WL 132417, *6 (Ohio App. July 18, 1991) (because "the kidnapping by deception in order to lure [the victim] to a place where he could be raped involved a separate animus from the restraint necessary to effectuate the rape . . . the trial court properly sentenced the [defendant] to consecutive sentences for rape and kidnapping"); *State* v. *Rollins*, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980) ("a number of courts have held that the forced movement of a crime victim during the course of a crime [that] is merely incidental to the perpetration of the crime, as from one room of a house to another, is not kidnapping if there is *no substantially increased risk of harm over and above that necessarily present* in the crime of robbery itself" (emphasis added)); *State* v. *Williams*, Docket No. 36772-2-I, 1997 WL 469623, *3 (Wn. App. August 18, 1997) (relevant issue to consider in determining if confinement, movement or detention is sufficient to warrant separate kidnapping conviction is "whether the defendant's conduct substantially increased [the] risk of harm over and above that necessarily present in the [underlying] crime . . . itself" (internal quotation marks omitted)), review denied, 134 Wn. 2d 1026, 958 P.2d 315 (1998).

Banks *v.* Commissioner of Correction

to wrongfully obtain property from, sexually violate, or physically injure the victim) or whether they imposed harms or risks on the victim beyond those that necessarily accompany any rape, robbery, or assault.

Understanding *Salamon* in this way also resolves the second question that divided the parties and the members of the Appellate Court in this case and the companion case, namely, whether conduct that is merely incidental to but goes beyond that necessary to commit the underlying crime satisfies the legislative definition of kidnapping. The cited language from *Salamon* is ambiguous and, arguably, consistent with either party's interpretation. Certainly, in *Hinds*, we suggested that the reading favored by the petitioner is the correct one; conduct that is wholly incidental to the commission of an underlying crime cannot qualify as kidnapping, regardless of whether it is strictly necessary to commit that crime. See id., 89–90. Understanding necessity in the manner that we have suggested is consistent with that approach.

It also is consistent with the approach followed by many of our sister state courts, on whose decisions we relied in *Salamon*. See *State* v. *Salamon*, supra, 287 Conn. 518, 527 and n.16. Those courts speak of restraints or restrictions on a victim's liberty as being merely incidental to the underlying crime, necessary to commit the underlying crime, inherent in the nature of the underlying crime, and having no independent criminal significance, often using those and related expressions more or less interchangeably. See, e.g., *United States* v. *Santistevan*, 25 M.J. 123, 126 (C.M.A. 1987); *Mackerley* v. *State*, 754 So. 2d 132, 137 (Fla. App. 2000), quashed on other grounds, 777 So. 2d 969 (Fla. 2001); *State* v. *Martin*, 222 N.C. App. 213, 221, 729 S.E.2d 717, review denied, 366 N.C. 413, 735 S.E.2d 187 (2012), and review dismissed, 372 N.C. 300, 826 S.E.2d 710 (2019); see also F. Wozniak, Annot., "Seizure or Deten-

Banks *v.* Commissioner of Correction

tion for Purpose of Committing Rape, Robbery, or Other Offense as Constituting Separate Crime of Kidnapping,'' 39 A.L.R.5th 283, 357, § 2[a] (1996) (describing tests used by different jurisdictions as being more or less formulaic ''but not substantially different''). Our own cases have, at times, followed the same approach. See, e.g., *State* v. *Fields*, supra, 302 Conn. 247, 252 (citing *Salamon* and conflating independent criminal significance, conduct that is not merely incidental to underlying offense, and restraint beyond that necessary to commit underlying offense).

These various terms, then, are merely different ways of expressing the same concept, namely, whether the restraint imposed evidenced an independent criminal intent or subjected the victims to risks distinct from those necessarily entailed by or inherent in the underlying offenses. The six *Salamon* factors offer a useful framework for answering those questions.

IV

We therefore conclude that the petitioner cannot prevail on his claim under *Salamon* because the respondent has demonstrated, in light of the undisputed facts presented at trial, that the absence of the instruction mandated by *Salamon* gave rise to no discernible risk of prejudice, let alone a risk sufficient to undermine confidence in the verdict, such that a properly instructed jury would have found the petitioner guilty beyond a reasonable doubt. Indeed, as we explained, we agree with our sister state courts, which have concluded, as a matter of law, that, when a perpetrator, having taken his victims' valuables, then leads them at gunpoint away from a highly visible commercial storefront and confines them in an isolated area of the store while he makes his escape, thereby exposing them to new and different risks, such conduct is not inherent

Banks *v.* Commissioner of Correction

in the nature of the robbery but, rather, indisputably has independent criminal significance.[16]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to render judgment affirming the judgment of the habeas court.

In this opinion ROBINSON, C. J., and MULLINS and KAHN, Js., concurred.

D'AURIA, J., with whom McDONALD, J., joins, concurring. Because I agree with the majority that, in the present case, the lack of a jury instruction pursuant to *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), was harmless, I concur in the result. I do not agree, however, with the standard that the majority adopts for determining whether any error was harmless under these circumstances. The majority determines that, when a petitioner seeking habeas relief establishes a *Salamon* error, the habeas court must assess the harm of that error according to the legal standard that the United States Supreme Court articulated in *Brecht* v. *Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (new trial mandated if instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks omitted)), rather than the more petitioner friendly standard adopted in *Neder* v. *United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (new trial required if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the [instructional] error"). I disagree

---

[16] Consequently, it is apparent, as Judge Keller concluded; see *Banks* v. *Commissioner of Correction*, supra, 184 Conn. App. 133 (*Keller, J.*, dissenting); that the petitioner could not prevail on his claim, even if we agreed with him that the respondent was required to establish harmlessness beyond a reasonable doubt. The concurring justices do not disagree with this conclusion.

Banks *v.* Commissioner of Correction

with the majority opinion for two reasons. First, because the petitioner, Mark Banks, cannot prevail under either standard, I do not believe that this court needs to—or should—decide which standard applies, especially as it is unclear how many, if any, future cases this standard will apply to. Second, I believe that *Neder* is the proper standard. Accordingly, I respectfully concur.

I

In *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 136 A.3d 596 (2016), we concluded that, because the petitioner would prevail under either the *Brecht* or *Neder* standards for determining the harmlessness of a *Salamon* violation on collateral review, we did not need to "enter the fray" and decide whether to adopt the more state friendly *Brecht* standard "and the uncertainties that accompany it." Id., 83. In the present case, I agree with the majority that the petitioner would *not* prevail under either standard,[1] and, in my view, the majority's decision to apply the *Brecht* standard is dictum. I therefore do not believe that this late in the day for *Salamon* claims there is any greater justification to "enter the fray" than there was five years ago in *Hinds*. In fact, I believe there is less.

It has been more than one decade since this court released its decision in *Salamon* and then held that the new rule in *Salamon* applies retroactively to collateral attacks on final judgments in *Luurtsema* v. *Commis-*

_____

[1] I agree fully with then Judge Keller's well reasoned dissenting opinion in the Appellate Court that the absence of a *Salamon* instruction was harmless beyond a reasonable doubt under the *Neder* standard. *Banks* v. *Commissioner of Correction*, 184 Conn. App. 101, 132–33, 194 A.3d 780 (2018) (*Keller, J.*, dissenting). The majority likewise agrees with Judge Keller that "the petitioner could not prevail on his claim even, if we agreed with him that the respondent [the Commissioner of Correction] was required to establish harmlessness beyond a reasonable doubt." Footnote 16 of the majority opinion.

Banks *v.* Commissioner of Correction

*sioner of Correction*, 299 Conn. 740, 769, 12 A.3d 817 (2011) (plurality opinion). In *Luurtsema*,[2] in holding that *Salamon* would apply retroactively to those litigants whose direct appeals already had been decided at the time of *Salamon*, we explained that, "[o]f the 1.5 percent of . . . inmates incarcerated for kidnapping or unlawful restraint, one can reasonably assume that only a small subset will fall within the ambit of *Salamon*." Id. Although the parties have not provided any data in the present case on the number of potential *Salamon* claims that remain for cases that already have become final, there is a real possibility that the new standard that the majority adopts might never be applied to another case.[3] I am not suggesting that, when this

_____

[2] I note that *Luurtsema* was a plurality decision. Nevertheless, the plurality's analysis in that case belies the majority's contention that this case supports the adoption of the *Brecht* standard. Additionally, the court in *Hinds*, which was a majority decision, relied heavily on *Luurtsema*, treating it as controlling law, and, thus, I do the same. See *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 61 ("we conclude that [the] retroactivity decision [in *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740] *compels* the conclusion that challenges to kidnapping instructions in criminal proceedings rendered final before *Salamon* are not subject to the procedural default rule" (emphasis added)).

[3] In *Epps* v. *Commissioner of Correction*, 327 Conn. 482, 175 A.3d 558 (2018), the petitioner's counsel represented in the petitioner's brief: "There are no records of cases by type of claim kept by the court or public defender, but a repeated canvass of appointed counsel turned up only three cases with potential to present *Luurtsema-Salamon* issues for decision by the habeas court. Counsel also have resolved by agreement a number of *Salamon* habeas cases without necessitating trial of the case." *Epps* v. *Commissioner of Correction*, Conn. Supreme Court Briefs & Appendices, November Term, 2017, Petitioner's Brief p. 25 n.23. Counsel for the respondent, the Commissioner of Correction, in *Epps* did not contradict this representation. Our own databases show no present cases pending in our court or the Appellate Court other than *Britton* v. *Commissioner of Correction*, 185 Conn. App. 388, 197 A.3d 895 (2018) (*Salamon* violation was harmless beyond reasonable doubt under *Neder*), petition for cert. filed (Conn. November 26, 2018) (No. 180266). The parties have provided this court with no data regarding how many cases our decision in this case will affect. With perhaps the exception of *Britton*, the present case and the companion case, *Bell* v. *Commissioner of Correction*, 339 Conn. 79, A.3d (2021), which we also decided today, might very well be the only cases in which this new standard will

Banks *v.* Commissioner of Correction

court's holding likely will not affect many cases, we should not resolve the issue. Rather, I believe that, when addressing the issue is not necessary to resolve the case, we should refrain from altering the applicable standard at the eleventh hour. Thus, as we are not required to decide this issue to adjudicate the petitioner's claims in the present case or the claims asserted in the companion case, *Bell* v. *Commissioner of Correction*, 339 Conn. 79, A.3d (2021), also decided today, I do not believe we should.

II

The majority having determined to reach the issue, I also disagree with its resolution of the issue. The majority properly notes that only twice have we had occasion to apply *Salamon* in the habeas context and contends that, in these two cases, we did not envision that such claims would be evaluated under the more petitioner friendly *Neder* standard. I disagree. I believe this court's retroactive application of the *Salamon* rule to both pending and final cases has strongly suggested that the *Neder* standard applies to all *Salamon* violations. Certainly, that has been the understanding of our Appellate Court, our habeas courts, and the respondent, the Commissioner of Correction. Further, unlike the majority, I also find there to be countervailing policy concerns that militate in favor of continuing to apply the *Neder* standard for claims such as those of the petitioner.

A

In *Salamon*, this court overruled our long-standing interpretation of this state's kidnapping statutes and

be applied. Moreover, as I discuss in greater detail in part II of this opinion, both the Appellate Court and habeas courts consistently have relied on *Luurtsema* and *Hinds* as holding that the *Neder* standard is the proper standard, thereby not only belying the majority's contention that these cases "strongly [suggest]" that the *Brecht* standard is more appropriate, but also showing that all but a very few remaining *Salamon* claims raised on collateral review will be subject to the *Brecht* standard.

Banks *v.* Commissioner of Correction

held that, when a criminal defendant is charged with kidnapping in conjunction with another underlying crime, such as rape or assault, the trial court must instruct the jury that it cannot find the defendant guilty of kidnapping if the restraint imposed on the victim was merely incidental to that underlying crime. *State* v. *Salamon*, supra, 287 Conn. 550. In so holding, we relied heavily on "the common law of kidnapping, the history and circumstances surrounding the promulgation of our current kidnapping statutes and the policy objectives animating those statutes . . . ." Id., 542. A prominent concern at the time of the enactment of our current kidnapping statutes was prosecutorial overcharging: "Beginning in the 1950s . . . questions surfaced about the propriety of [our] expansively worded kidnapping statutes. In particular, concerns were expressed that the newly adopted kidnapping statutes permitted the imposition of extremely severe sanctions for a broad and ill defined range of behavior, including relatively trivial types of restraint. . . . [E]xamples of abusive prosecution for kidnapping [were] common, [so the legislature sought] to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice . . . ." (Citations omitted; internal quotation marks omitted.) Id., 538–39. We noted in *Salamon* that, in drafting our current kidnapping statute, the legislature "intended to create a new statutory scheme that recognized varying degrees of unlawful restrictions on a victim's liberty by drawing a distinction between a 'restraint,' which, standing alone, comprises the crime of unlawful restraint, and an 'abduction,' which comprises the crime of kidnapping," thereby intending "to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of

Banks *v.* Commissioner of Correction

a victim that are merely incidental to and necessary for the commission of another crime against that victim.'' Id., 541–42. Nevertheless, in interpreting our kidnapping statutes prior to *Salamon*, this court failed to recognize this exclusion. Id., 543. ''Unfortunately, that interpretation has afforded prosecutors virtually unbridled discretion to charge the same conduct either as a kidnapping or as an unlawful restraint despite the significant differences in the penalties that attach to those offenses. Similarly, our prior construction of the kidnapping statutes has permitted prosecutors—indeed, it has encouraged them—to include a kidnapping charge in any case involving a sexual assault or robbery.'' Id., 543–44.

Subsequently, but with limited analysis, this court in *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 (2008) (overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008)),[4] superseded in part after reconsideration en banc, 291 Conn. 574, 969 A.2d 710 (2009), applied the new rule in *Salamon* retroactively to direct appeals pending at the time *Salamon* was decided. *State* v. *Sanseverino*, supra, 287 Conn. 620 n.11. Not until approximately three years after *Salamon* did this court address its applicability to collateral attacks on final judgments, although we did not have to address the proper standard for evaluating harm because the retroactivity issue came to this court by way of reserved question.

In *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740, we agreed with the petitioner that, ''as a matter of state common law, *Salamon* should be afforded fully retroactive effect,'' including as to collateral attacks on final judgments by way of habeas petitions. Id., 751 (plurality opinion). We explained that,

---

[4] In *DeJesus*, this court overruled *Sanseverino* to the extent that *Sanseverino* held that a judgment of acquittal, rather than a new trial, could serve as a proper remedy for a *Salamon* violation.

Banks *v.* Commissioner of Correction

"[a]s a matter of federal constitutional law, each jurisdiction is free to decide whether, and under what circumstances, it will afford habeas petitioners the retroactive benefit of new judicial interpretations of the substantive criminal law issued after their convictions became final." Id., 754 (plurality opinion). We recognized that, "in the federal system, the United States Supreme Court has adopted a per se rule that, when federal courts reinterpret congressional legislation, new interpretations of substantive criminal statutes must be applied retroactively on collateral review." Id., 754–55 (plurality opinion).

Our own determination of retroactivity in *Luurtsema* focused on the purpose of habeas relief: "The principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness. . . . To mount a successful collateral attack on his conviction, a prisoner must demonstrate . . . a fundamental unfairness or miscarriage of justice . . . ." (Internal quotation marks omitted.) Id., 758 (plurality opinion). We reasoned that, "regardless of whether one reads *Salamon* to be a change or clarification of the law, the court in *Salamon* saw itself as discerning the original legislative meaning of [General Statutes] § 53a-92 (a) (2) (A). . . . If the legislature never intended an assault to constitute kidnapping, without evidence of the perpetrator's independent intent to restrain the victim, then the petitioner . . . stands convicted of a crime that he arguably did not commit. This conclusion raises serious due process concerns. It is well settled that due process requires the state to prove every element of the offense charged beyond a reasonable doubt. . . . Under our system of justice, considerations of finality simply cannot justify the continued incarceration of someone who did not commit the crime of which he stands convicted." (Citations omitted; internal quotation marks omitted.) Id., 758–59 (plurality opinion). Thus, although we declined

Banks *v.* Commissioner of Correction

the petitioner's invitation to adopt a per se rule in favor of full retroactivity, we concluded that, "when an appellate court provides a new interpretation of a substantive criminal statute, an inmate convicted under a prior, more expansive reading of the statute presumptively will be entitled to the benefit of the new interpretation on collateral attack." Id., 760 (plurality opinion).

This court in *Luurtsema* proceeded at some length to reject the "five rationales either for adopting a per se rule against retroactive relief or for denying relief in [that] case: (1) the fact that law enforcement relied on the old interpretation of the kidnapping statutes while trying the petitioner; (2) the fact that the retroactive application of *Salamon* has no deterrent value or remedial purpose; (3) the fear that our courts will be 'flooded' with habeas petitions from other inmates convicted [of kidnapping]; (4) the difficulty of retrying such cases where significant time has elapsed since conviction; and, perhaps most importantly (5) the concern that victims will be retraumatized by again having to testify and endure another round of judicial proceedings." Id., 765 (plurality opinion). In response to these arguments, we explained that "many of the concerns raised by the state in the habeas context apply with equal force to direct appeals, in which it is undisputed that appellants receive the benefit of retroactive application of judicial decisions that narrow the scope of liability under a criminal statute." Id., 766 (plurality opinion).[5] Unlike the majority, I believe that this court's

[5] We pointed out in *Luurtsema* that *State* v. *Sanseverino*, supra, 287 Conn. 620 n.11, provided an instructive case in point: "The crimes charged in [*Sanseverino*] commenced in June or July of 1998 . . . a mere two to three months after the incident for which the petitioner in [*Luurtsema*] was convicted. Whereas the petitioner's conviction became final in 2003, however, *Sanseverino* was still under review when we decided *Salamon* in 2008. Any concerns regarding prosecutorial reliance and the burdens associated with retrying a ten year old crime apply to *Sanseverino* no less than to [*Luurtsema*]." (Citation omitted.) *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 766–67 (plurality opinion).

Also, more specifically as to the respondent's third rationale regarding the opening of the floodgates, this court acknowledged that "[t]here is little

64 OCTOBER, 2021 339 Conn. 1

Banks *v.* Commissioner of Correction

rejection of the state's arguments in *Luurtsema* supports the *Neder* standard, not the *Brecht* standard.

First, although the *Neder* standard was not at issue in *Luurtsema*, we signaled that it applies on collateral review. It is not so, as the majority suggests, that "we did not envision that such claims would be evaluated under the stringent *Neder* standard" because "we thought that many *Salamon* cases could be disposed of summarily on the ground of harmless error . . . ." In *Luurtsema*, we emphasized that the state's concerns over applying *Salamon* retroactively to cases on collateral review applied equally to our earlier determination to apply *Salamon* retroactively to cases pending on direct appeal when we decided *Sanseverino*. See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 769–70 (plurality opinion). We went on to indicate that error arising from the lack of a *Salamon* instruction in cases brought before the court on collateral review would be reviewed for harm; see id. (plurality opinion); citing to *State* v. *Hampton*, 293 Conn. 435, 463–64, 978 A.2d 1089 (2009), which had applied the *Neder* harmless error standard.

doubt that some petitioners will come forward contending that they are serving substantially longer sentences than are prescribed by the [Penal] [C]ode, as properly construed. In [his] brief, however, the [respondent] has identified only five such petitions that have been filed in the more than two years since we decided *Salamon* and *Sanseverino*. At oral argument before this court, the [respondent] declined to provide additional information as to the number of present inmates who might have a colorable claim under *Salamon*. Of the 1.5 percent of . . . inmates incarcerated for kidnapping or unlawful restraint, one can reasonably assume that only a small subset will fall within the ambit of *Salamon*. Of those, we expect that courts will be able to dispose summarily of many cases where it is sufficiently clear from the evidence presented at trial that the petitioner was guilty of kidnapping, as properly defined, that any error arising from a failure to instruct the jury in accordance with the rule in *Salamon* was harmless. See, e.g., *State* v. *Hampton*, 293 Conn. 435, 463–64, 978 A.2d 1089 (2009). Likewise, we doubt the [respondent] will expend the resources to retry cases [when] it is reasonably clear that a petitioner could not have been convicted of kidnapping under the correct interpretation of the statute." (Footnote omitted.) *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 769–70 (plurality opinion).

Banks *v.* Commissioner of Correction

Subsequently, in *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 56, this court conceded that, by including this citation to *Hampton*, we had "indicated that the proper standard to make such an assessment would be the harmless error standard applied on direct appeal," i.e., *Neder*. See id., 77. Thus, to the extent that this court in *Luurtsema* "strongly suggested" anything about the proper harmless error standard to apply on collateral review, it has strongly suggested the *Neder* standard.

In *Hinds*, this court was asked to address how the retroactivity of *Salamon* on collateral review interacted with our procedural default rule.[6] Id., 60. We concluded that "[the] retroactivity decision [in *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740] compels the conclusion that challenges to kidnapping instructions in criminal proceedings rendered final before *Salamon* are not subject to the procedural default rule." *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 61. In reaching this conclusion, this court examined its reasoning in *Luurtsema* for applying the rule in *Salamon* retroactively and determined that this reasoning was inconsistent with the procedural default rule: "[A]pplication of the procedural default bar to protect finality of judgments seems inconsistent with the reasoning in [*Luurtsema*] that the interests of finality must give way to the demands of liberty and a proper respect for the intent of the legislative branch." (Internal quotation marks omitted.) Id., 73.

---

[6] "[W]e have adopted the procedural default standard prescribed in *Wainwright* v. *Sykes*, [433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977)]. . . . Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . ." (Citations omitted; internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 71.

Banks *v.* Commissioner of Correction

Particularly significant to the issue at hand, we specifically noted in *Hinds* that, in *Luurtsema*, we did not apply any heightened standard, such as the procedural default doctrine's heightened prejudice standard, to keep any floodgates from swinging open.[7] Id., 74–76. Rather, we recognized that, in *Luurtsema*, we cited the *Neder* harmless error standard for direct appeal. See id., 75. Thus, this court already has rejected the application of a heightened prejudice standard to *Salamon* claims on collateral review. In *Hinds*, this court then went on to discuss the applicable standard for determining harm. Again, we recognized that, "[i]n [*Luurtsema*], the court *indicated* that the proper standard to make such an assessment would be the harmless error standard applied on direct appeal [by citing to *Hampton*]." (Emphasis added.) Id., 77.

Only after deciding that "the petitioner [in *Hinds* was] entitled to relief under our established harmless error standard"; id., 81; did we "note that this court has not had the occasion to consider whether, even in the absence of procedural default, a more stringent standard of harm should apply in collateral proceedings,"

_____

[7] Specifically, in reaching our conclusion in *Hinds*, we explained: "Other aspects of the court's reasoning [in *Luurtsema* also] bolster our conclusion that this holding was not intended to afford relief to only those petitioners who could avoid or overcome the procedural default bar. The court in [*Luurtsema*] extensively considered limitations on its retroactivity ruling, but did not cite procedural default as such a limitation. Availability of that doctrine and its heightened prejudice standard would have been a natural response to the [respondent's] floodgates argument had the court intended the doctrine to apply. Instead, the court responded [by explaining that] . . . one can reasonably assume that only a small subset will fall within the ambit of *Salamon*. . . . One particular aspect of this response is telling. The court cited the harmless error standard for direct appeal—a standard wholly inconsistent with the actual prejudice standard for procedurally defaulted claims—as the limiting mechanism for colorable but ultimately nonmeritorious claims." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 74–75.

Banks *v.* Commissioner of Correction

such as the *Brecht* standard.[8] Id. Nevertheless, because the dissenting justices' conclusion in *Hinds* that the petitioner was "not entitled to a new trial due to his failure to establish the actual prejudice to overcome a procedurally defaulted claim appear[ed] to signal a retreat from our holdings in *Salamon* and [*Luurtsema*], we . . . explain[ed] why the petitioner [in *Hinds*] would prevail even under the more stringent standard" the dissenting justices applied. Id., 83.

Although we decided *Luurtsema* on a reservation for advice and a stipulation of facts, and our language in *Hinds* regarding *Brecht* might arguably be considered dictum,[9] we noted in *Hinds* that *Neder* was "the standard that was applied by the habeas court in [that] case and ha[d] been applied in several other cases. See, e.g., *Eric M.* v. *Commissioner of Correction*, 153 Conn. App. 837, 845, 108 A.3d 1128 (2014), cert. denied, 315 Conn. 915, 106 A.3d 308 (2015); *St. John* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-11-4003987-S (March 7, 2013); see also *Epps* v. *Commissioner of Correction*, 153 Conn. App. 729, 738, 740, 104 A.3d 760 (2014) (determining that petitioner must overcome procedural default but applying direct appeal

---

[8] "In *Brecht* v. *Abrahamson*, supra, 507 U.S. 623, a bare majority of the United States Supreme Court departed from its history of more than 200 years of parity between direct appeals and habeas corpus proceedings for constitutional claims. . . . Citing federalism, comity, finality and other prudential considerations, the court determined that habeas proceedings require a standard that imposes a less stringent burden on the state when the constitutional error is not structural. . . . *Brecht* and its progeny have raised numerous questions as to the precise standard to be applied in determining whether a particular type of error is harmless, and what degree of certainty as to whether that standard has been met." (Citations omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 81–82.

[9] It is at *best* arguable that *Hinds*' use of the *Neder* standard was dictum. In fact, because nothing in the majority's opinion in *Hinds* suggests that *Brecht* is the proper standard, and because the majority in *Hinds* explained that it analyzed the petitioner's claim in that case under the *Brecht* standard only to respond to the arguments of the dissenting justices, it is more accurate to say that any discussion of the *Brecht* standard was dictum.

Banks *v.* Commissioner of Correction

harmless error standard in prejudice analysis); *Nogueira*
v. *Warden*, Superior Court, judicial district of Tolland,
Docket No. CV-14-4006033-S (June 10, 2015) (same);
*Smith* v. *Warden*, Superior Court, judicial district of
Tolland, Docket No. CV-08-4002747-S (September 13,
2011) (same).” *Hinds* v. *Commissioner of Correction*,
supra, 321 Conn. 77. *Hinds* does not indicate that a
contrary standard might apply. Although limited, this
court’s prior case law applying the rule in *Salamon*
retroactively on collateral review suggests that the
*Neder* standard is the proper standard for determining
harm, although the parties did not explicitly raise, and
this court did not explicitly address, this issue.

The majority’s contention that our prior case law
“strongly suggests” the adoption of the *Brecht* standard
is belied by the plain language of these cases and sug-
gests that these cases have been misunderstood by both
our habeas courts and the Appellate Court, which, con-
sistent with the signals this court gave in *Hinds*, have
uniformly applied the *Neder* standard to *Salamon* viola-
tions raised in a collateral proceeding. See *Palmer* v.
*Commissioner of Correction*, 202 Conn. App. 902, 242
A.3d 1084 (2021) (per curiam affirmance of judgment
of habeas court, which applied *Neder* harmless error
standard to *Salamon* claim); *John B.* v. *Commissioner
of Correction*, 194 Conn. App. 767, 774, 222 A.3d 984
(2019) (applying *Neder* harmless error standard to *Sala-
mon* claim raised in habeas appeal, citing to *Hinds* as
support), cert. denied, 334 Conn. 919, 222 A.3d 513
(2020); *Britton* v. *Commissioner of Correction*, 185
Conn. App. 388, 400, 197 A.3d 895 (2018) (same), peti-
tion for cert. filed (Conn. November 26, 2018) (No.
180266); *Pereira* v. *Commissioner of Correction*, 176
Conn. App. 762, 768, 171 A.3d 105 (same), cert. denied,
327 Conn. 984, 175 A.3d 43 (2017); *White* v. *Commis-
sioner of Correction*, 170 Conn. App. 415, 427, 154 A.3d
1054 (2017) (same); *Nogueira* v. *Commissioner of Cor-
rection*, 168 Conn. App. 803, 814, 149 A.3d 983 (same),

Banks *v.* Commissioner of Correction

cert. denied, 323 Conn. 949, 169 A.3d 792 (2016); *Farmer*
v. *Commissioner of Correction*, 165 Conn. App. 455,
460, 139 A.3d 767 (same), cert. denied, 323 Conn. 905,
150 A.3d 685 (2016); *Coltherst* v. *Commissioner of Cor-
rection*, Docket No. CV-15-4007268-S, 2019 WL 7425147,
*10–12 (Conn. Super. November 19, 2019) (applying
*Neder* standard and finding lack of *Salamon* instruction
harmless). I do not mean to suggest that this court
should not correct errors by lower courts or not clarify
ambiguous case law. But I do not believe that this is
what the majority is doing in its analysis. Rather, the
majority has decided for policy reasons to reverse
course and to adopt a standard inconsistent with our
prior case law.

In fact, even as late as 2014, in *Epps* v. *Commissioner
of Correction*, 153 Conn. App. 729, 738, 740, 104 A.3d
760 (2014), appeal dismissed, 327 Conn. 482, 175 A.3d
558 (2018), the respondent was arguing in habeas cases
involving the failure to give a *Salamon* instruction that
the *Neder* standard for harmless error applied, a stan-
dard he did not prevail on in the Appellate Court in
*Epps*. Only before this court in *Epps* did the respondent
begin to argue that the *Brecht* standard should govern.[10]

_____

[10] After this court released its decision in *Hinds*, in *Epps* v. *Commissioner
of Correction*, 327 Conn. 482, 175 A.3d 558 (2018), we permitted the respon-
dent, whose petition for certification to appeal was pending at the time, "to
file an amended petition for certification. Over the petitioner's objection,
this court granted the respondent's amended petition, which raised the
question 'left unresolved' by *Hinds* regarding the proper measurement of
harm in collateral proceedings like the . . . one [in *Epps*] and the question
of whether, irrespective of which standard applied, harm had been estab-
lished in the petitioner's criminal case." Id., 484. This court, however, subse-
quently dismissed the appeal on the ground that certification was
improvidently granted because "[t]he respondent had squarely argued to
the habeas court that the petition should be assessed under the harmless
beyond a reasonable doubt standard. The respondent never argued in the
alternative that a higher standard of harmfulness should apply to collateral
proceedings even if the petitioner's claim was not subject to procedural
default, despite federal case law applying a higher standard since 1993.
Accordingly, we conclude[d] that this [was] not the proper case in which
to fairly address this consequential issue . . . ." Id., 485.

Banks *v.* Commissioner of Correction

Since the Appellate Court decided *Epps*, the respondent has relied on the *Neder* standard in multiple cases before the Appellate Court in which a *Salamon* violation was raised, not even mentioning *Brecht* in appellate briefs. See, e.g., *Nogueira* v. *Commissioner of Correction*, supra, 168 Conn. App. 814; *Farmer* v. *Commissioner of Correction*, supra, 165 Conn. App. 460. From my research, it appears that the first habeas case in which the respondent challenged the *Neder* standard before the Appellate Court was *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 427, which was not decided until 2017. Thus, not only the courts, but also the respondent has interpreted *Hinds* as applying, if not adopting, the *Neder* standard, which is reasonable given our analysis in that case.

B

Having made clear in *Luurtsema* that the retroactivity of new judicial interpretations of substantive criminal law on collateral review is a "matter of state common law," and that we are not bound by federal law, the determination of the appropriate standard to apply for analyzing harm is likewise a matter of state common law and a policy question for this court to determine. I do not read the majority opinion to suggest otherwise. See, e.g., *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 255, 819 A.2d 773 (2003) (determination of proper burden of proof based on certain policy considerations); *Albert Mendel & Son, Inc.* v. *Krogh*, 4 Conn. App. 117, 124, 492 A.2d 536 (1985) ("The proper allocation of the burden of proof may be distilled to a question of policy and fairness based on experience in different situations. . . . A number of variables are considered in determining where the burden properly lies. One consideration is which party has readier access to knowledge about the fact in question." (Citations omitted; footnote omit-

Banks *v.* Commissioner of Correction

ted.)). I would come to a different policy determination than the majority does.

*Brecht* concerned a federal court's collateral review of a state court criminal judgment pursuant to 28 U.S.C. § 2254. See *Brecht* v. *Abrahamson*, supra, 507 U.S. 626. The court in *Brecht* and in later cases emphasized that the choice to apply a more government friendly harmlessness standard was driven in large part by concerns unique to federal habeas review of state court judgments—namely, that the application of a petitioner friendly standard as in *Neder* would (1) invade state sovereignty over criminal matters (i.e., federalism and comity), (2) undercut the historic limitation of habeas relief to those " 'grievously wronged,' " (3) infringe on a state's interest in finality, and (4) impose significant societal costs. Id., 633–38; see also *Fry* v. *Pliler*, 551 U.S. 112, 117, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007). Notwithstanding significant differences between federal habeas review of state criminal judgments and the situation we confront upon a finding of a *Salamon* violation, the majority's own rationale in opting for the *Brecht* standard is still driven by these policies in significant part. This is where I disagree most pointedly with the court's opinion.

First,[11] unlike the majority, I see no need for this standard to be "consistent with how we handle other

[11] Obviously, federalism and comity do not inform our determination of the proper standard to apply. Thus, I am not persuaded by the fact that federal courts have adopted the *Brecht* standard as the proper harmlessness standard for collateral review of a state conviction for constitutional errors or by the fact that a number of sister state courts have followed suit. As mentioned previously, we are not bound by federal law in determining the retroactivity of new judicial interpretations of substantive criminal law on collateral review, which is a matter of state law. Also, as the majority concedes, many jurisdictions, if not the majority of jurisdictions, apply the *Neder* standard on collateral as well as on direct review of state convictions for constitutional errors. See, e.g., *In re Martinez*, 3 Cal. 5th 1216, 1225, 407 P.3d 1, 226 Cal. Rptr. 3d 315 (2017); *Guam* v. *Ojeda*, Docket No. CRA10-011, 2011 WL 6937376, *13 (Guam December 23, 2011); *Hill* v. *State*, 615 N.W.2d 135, 140–41 (N.D. 2000).

Banks *v.* Commissioner of Correction

claims of error in habeas actions.'' A *Salamon* violation
is unlike many other claims of error in habeas actions:
it is a determination that the state, in prosecuting a
defendant, was unconstitutionally relieved of proving
an essential element of the crime of kidnapping. In both
*Salamon* and *Luurtsema*, this court indicated that a
reinterpretation of the language of our kidnapping stat-
ute was long overdue and that the legislature never
intended to criminalize conduct that this court had erro-
neously interpreted the statute to capture, i.e., a
restraint of a victim merely incidental to the commis-
sion of a separate crime. For nearly one-half century,
interpreting the statute broadly had led to prosecutors
overcharging and juries finding defendants guilty on
allegations the legislature never intended to punish.

A *Salamon* claim is traditionally the kind of claim
that should have been raised on direct appeal and is
not permitted to be raised in a habeas action unless
the petitioner can satisfy the procedural default rule.
See *Jackson* v. *Commissioner of Correction*, 227 Conn.
124, 131–32, 629 A.2d 413 (1993). Similar claims about
the proper interpretation of our kidnapping statutes
had been made and rejected several times in the thirty

Moreover, the present case, involving state court collateral review of a
state conviction, is more akin to federal court collateral review of a *federal*
conviction for constitutional error, than to federal court collateral review
of a *state* conviction for constitutional error. There is currently a split among
the federal courts of appeals regarding whether the *Brecht* standard applies
to federal habeas review of federal court convictions, thereby suggesting
that *Brecht* is not clearly the proper standard to apply in this case. See
*James* v. *United States*, 217 Fed. Appx. 431, 435 (6th Cir. 2007) (''State court
convictions are examined on collateral review to determine whether an
error 'had substantial and injurious effect or influence in determining the
jury's verdict.' . . . This standard does not apply to collateral review of
[federal court] convictions, as [state court] convictions are entitled to special
deference.'' (Citations omitted.)). But see *United States* v. *Smith*, 723 F.3d
510, 516 (4th Cir. 2013) (noting that United States Supreme Court has not
decided this issue and applying *Brecht* standard because ''society has the
same interest in the finality of federal convictions as it does in state convic-
tions''), cert. denied, 572 U.S. 1043, 134 S. Ct. 1774, 188 L. Ed. 2d 610 (2014).

Banks *v.* Commissioner of Correction

years preceding *Salamon*. See *State* v. *Salamon*, supra, 287 Conn. 531 ("Since 1977, we have had numerous opportunities to examine the scope of the kidnapping statutes, generally in response to a claim that the crime of kidnapping was not intended to apply to a restraint that was merely incidental to the commission of another crime. See, e.g., *State* v. *Luurtsema*, [262 Conn. 179, 200, 811 A.2d 223 (2002)]; *State* v. *Wilcox*, [254 Conn. 441, 465–66, 758 A.2d 824 (2000)]; *State* v. *Amarillo*, [198 Conn. 285, 304–306, 503 A.2d 146 (1986)]; *State* v. *Vass*, 191 Conn. 604, 614, 469 A.2d 767 (1983); *State* v. *Johnson*, 185 Conn. 163, 177–78, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Briggs*, 179 Conn. 328, 338–39, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); *State* v. *DeWitt*, 177 Conn. 637, 640– 41, 419 A.2d 861 (1979); *State* v. *Lee*, [177 Conn. 335, 342–43, 417 A.2d 354 (1979)]; *State* v. *Chetcuti*, [173 Conn. 165, 170, 377 A.2d 263 (1977)]."). Bringing such an argument to the court was not for the fainthearted— as it bordered on being frivolous—and at least could be criticized as "depreciat[ing]" other claims. (Internal quotation marks omitted.) *State* v. *Pelletier*, 209 Conn. 564, 567, 552 A.2d 805 (1989). Until one day, this court agreed.

For reasons of fairness, as discussed previously, this court in *Luurtsema* and *Hinds* held that *Salamon* claims raised for the first time in a habeas action are unique—the byproduct of the retroactivity exception to the general rule against these kinds of claims being raised on collateral review, along with the procedural default rule being forgiven. For this reason, I do not see why there is any need for us to apply a standard consistent with that employed in other habeas cases. Rather, if this court is trying to create consistency, the same standard should be used for *Salamon* claims both on direct review and collateral review, as there is no real

Banks *v.* Commissioner of Correction

distinction between the claims other than the temporal relation of the case to our decision in *Salamon*, which is merely a matter of good or bad fortune.

Further, this court, our Appellate Court, and habeas courts consistently have applied the *Neder* standard to *Salamon* claims on collateral review. See *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 77; see also id. (citing cases). So, not only would the petitioner in this case be afforded less protection than defendants whose cases were pending or were initiated after *Salamon*, but he will be afforded less protection than other habeas petitioners who have raised *Salamon* claims on collateral review in the years since *Luurtsema* and *Hinds* but prior to our decision in the present case. I am not suggesting that these lower court cases bind our analysis. I am suggesting that these cases demonstrate the unfairness of adopting the *Brecht* standard at this late date, a clearly appropriate policy consideration in determining whether this court should alter the applicable standard.

The majority defends this arbitrariness by rationalizing that "the somewhat scattershot nature of harmless error jurisprudence, with standards varying by the type of error at issue, the stage of review, and the jurisdiction in which the claim is reviewed, means that whichever standard we apply to *Salamon* errors in state habeas cases may appear to be unfair or incongruous from one vantage or another." Choosing the *Brecht* standard over the *Neder* standard seems to me to be little more than an attempt to counterbalance this court's determination to apply *Salamon* retroactively to collateral challenges and to forgive the procedural default rule by giving the respondent a break on the harmlessness standard. The majority reasons: "It certainly will not seem unjust from the respondent's standpoint to require a showing that there is some reasonable likelihood that the failure to give the jury a *Salamon* instruction had a substantial

Banks *v.* Commissioner of Correction

and injurious effect or influence on the outcome before requiring the state to retry the petitioner for crimes that were committed more than twenty-five years ago.''

In my view, this reasoning misses the mark and loosens *Luurtsema* and *Hinds* from their jurisprudential moorings. The twenty-five years since the date of the petitioner's trial should of course play no role in this analysis but merely provide color. To the extent that the majority's rationale reflects a concern about finality, this court has already indicated that that interest ''must give way to the demands of liberty and a proper respect for the intent of the legislative branch.'' (Internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 73; see also *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 759 (plurality opinion) (''considerations of finality simply cannot justify the continued incarceration of someone who did not commit the crime of which he stands convicted''). It is not the petitioner's fault that this court awakened late to the fact that the legislature never intended for the present language of our kidnapping statute to extend as broadly as it had been construed, more than one decade after his criminal trial and eight years after his direct appeal became final. Although the majority is correct that it is not the *state's* fault, either, that this court reinterpreted our kidnapping statutes when it did, the state surely benefited more from a jurisprudential regime that relieved it of having to prove an essential element than did those defendants accused of the kidnappings.[12]

_____

[12] It makes sense for the respondent to bear the heavier burden of proving harmlessness on collateral review, such as in the present case, as the state not only was relieved of having to bear its burden of proving an element at the underlying criminal trial, but it was more likely to establish, even pre-*Salamon*, the underlying facts regarding the kidnapping, such as the timing and length of the restraint. In other words, although the state may have asked additional questions of the witnesses in light of *Salamon*, it was more likely to have put forth all of its admissible evidence regarding the crime, including the length of the restraint and when the restraint occurred

Banks *v.* Commissioner of Correction

In holding that *Salamon* applies retroactively to cases that are already final, this court recognized that older cases may need to be retried, accepting this as a necessary consequence of correcting injustices that had occurred as a result of prosecutorial overcharging and this court's failure to construe our statutes properly so as to curb that practice. See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 766–67, 772–73 (plurality opinion). The fact that the state must now deal with these consequences should not come at the expense of the petitioner, especially when limiting the petitioner's protection out of fairness to the state would contradict the purpose of our holdings in *Luurtsema* and *Hinds*. Moreover, this consequence is not unique to collateral review, as this court noted in *Luurtsema* when it recognized that cases pending on direct appeal at the time of *Salamon* might also require retrial years after the initial criminal trial. Id., 766–67 (plurality opinion).

There is perhaps no better way to summarize my concerns regarding the fairness of the court's rationale in the present case than that of the sage author of the majority opinion (whose collegiality and guidance I already miss): "[T]o apply *Brecht* in the present case would be unfair to the petitioner and to others similarly situated. That this court opted to revisit and revise our interpretation of the state's kidnapping laws following his conviction is no more the fault of the petitioner than of the state. Although would-be offenders were on notice in 1995 that they could be charged with kidnapping solely on the basis of the restraint inherent in robberies or assaults, they, like the state, did not have

in relation to other conduct, than the defendant was to have defended on grounds relevant to *Salamon*. The state typically attempts to provide the fact finder with a complete picture of the crime, whereas the defendant would have had no motivation, pre-*Salamon*, to ask questions and to offer evidence regarding the length and timing of the restraint that were unnecessary pre-*Salamon*.

Banks *v.* Commissioner of Correction

any reason to try their cases with the *Salamon* distinction in mind. Moreover, it may seem discrepant to assess the impact of the instructional error according to the more forgiving *Brecht* standard when, if we had decided *Salamon* one decade earlier, while the petitioner's direct appeal was pending, the state would have borne the burden of proving that the error was harmless beyond a reasonable doubt.''

III

Which brings me back to my original point: Why are we deciding this issue at this late date? By declining to ''enter the fray'' and answer this question; *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 83; we would not, in my view, be ''shrink[ing] from our duty'' any more than this court already has to date in declining to answer this unique question in *Hinds*. Footnote 6 of the majority opinion. This court, the Appellate Court, and habeas courts, consistent with the signals this court gave in *Hinds*, have been applying the *Neder* standard to *Salamon* claims raised on collateral review, and both petitioners and the respondent have managed to prevail under that standard. The parties have provided us with no data regarding how many potential cases remain to which the *Brecht* standard would apply, especially as it appears that some cases have been resolved by agreement. See footnote 3 of this opinion. The number cannot be infinite. Most evidence points to the fact that it is likely a very small number, and obviously shrinking. It is of course true that a lower court cannot bind this court and that courts of last resort, such as the United States Supreme Court, may allow issues to ''percolate'' before deciding them. But it must be rare for a court to allow an issue to percolate to the point of virtual extinction and to decide it only after giving strong signals as to the correct outcome, and after the lower courts have uniformly decided the issue that way.

Banks *v.* Commissioner of Correction

Given that the outcome of this appeal would be the same regardless of the standard applied, and that the majority's holding will possibly have little to no effect going forward, I believe it is imprudent to address and decide this issue. In my view, if there are in fact any cases left in this shrinking universe to which today's announcement will apply, it is unfortunate that the court is now changing its mind about the standard that will govern harmlessness. It is also ironic given that the fallout from *Salamon* itself has concerned the application of retroactivity rules fairly to a change of this court's mind.

Policy considerations support this view. The petitioner in the present case and any petitioners going forward, assuming there are any, will receive less protection than those who happened to have their habeas petitions decided before today's decision. This appears to be a matter of pure chance and perpetuates the unfairness that *Salamon* and its progeny have attempted to correct. Every petitioner to have brought a collateral *Salamon* challenge has had appointed counsel. We have no understanding about how the public defender's office prioritizes inmate cases or whether and to what extent inmates might understand that they had a *Salamon* claim. Finally, I am concerned that, by needlessly "enter[ing] the fray"; *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 83; regarding which standard to apply, this court might not realize how its decision to adopt the *Brecht* standard in the context of a *Salamon* claim might have possible ramifications in contexts we have yet to anticipate.

Accordingly, I respectfully concur.

ECKER, J., concurring in the judgment. I respectfully disagree with the majority opinion to the extent that it adopts and applies the harmless error analysis set forth

in *Brecht* v. *Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). See id. (new trial is mandated if instructional error "had substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks omitted)). For the reasons explained in part II of Justice D'Auria's concurring opinion in this case, I would instead apply the standard articulated in *Neder* v. *United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). See id. (new trial is required unless it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the [instructional] error"). Accordingly, I join part II of Justice D'Auria's concurring opinion. I nevertheless concur in the judgment because, applying the *Neder* standard, the state has met its burden of establishing harmless error on this record. See footnote 1 of Justice D'Auria's concurring opinion.

———————————————